THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v JOHN DOE, Respondent.

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v LOU V. TEMPERA, Respondent.

Second Department, December 31, 1981

APPEARANCES OF COUNSEL

*Patrick Henry, District Attorney* (*Steve Fondulis* and *Mark D. Cohen* of counsel), for appellant.

*Stephen P. Scaring* for Lou V. Tempera, respondent.

*David J. Gilmartin, County Attorney* (*Eugene R. Kelley* of counsel), for Board of Public Disclosure, respondent.

**OPINION OF THE COURT**

MARGETT, J.

Our primary task upon this appeal is to determine whether either the Suffolk County Financial Disclosure Law (the Disclosure Law),[1] the Fourth Amendment to the Constitution of the United States or the common-law "public interest privilege" provides a proper basis for quashing a duly issued Grand Jury subpoena duces tecum which demands the production of financial disclosure statements allegedly filed with the Suffolk County Board of Public Disclosure (the board) by a Suffolk County public official pursuant to the Disclosure Law. Our conclusion is that under the circumstances presented here, neither the Disclosure Law, the Fourth Amendment, nor the public interest privilege may be properly relied upon to shield such statements from production before the Grand Jury in compliance with its subpoena duces tecum. Since we perceive no other reason to quash the subpoena in question, we reverse the order of the County Court (110 Misc 2d 595) and deny the motions to quash made by the board and the public official.

---

1. Local Laws, 1978, No. 12 of Suffolk County.

Since the Disclosure Law is of central importance to this appeal, close attention to its terms is warranted. Enacted in 1978, the law declares in section 2 that it is the policy of Suffolk County:

"(1) To insure to the citizens of Suffolk County a county government that is administered free from any conflicts of interest by employees who affect the integrity of the county government;

"(2) To recognize that the citizens of Suffolk County are entitled to a high standard of candor from their public servants;

"(3) To provide a means by which those County employees may disclose those aspects of their business and personal affairs, which, even though they may not relate to the specific duties of the county employee, that [sic] reflect upon the integrity of the county government;

"(4) To discourage and detect corruption and the appearance of corruption;

"(5) To instill in the public a sense of confidence and integrity and partiality [sic] of its public servants."

In furtherance of this policy, the law requires all employees of the county who are elected county officials, department heads, chief deputy department heads or "exempt personnel graded 32 and above" (§ 4, subd [1]) to file annually with the Board of Public Disclosure[2] a completed "Financial Disclosure Statement". The precise form of this statement is also prescribed by the law. As so prescribed, the statement is approximately 10 pages in length, and requests that employees list and describe their assets, liabilities and sources of income and those of their spouses by filling in blanks in response to specific requests stated within the form. The form states that the disclosure statement is submitted "under oath". It bears an "Attestation"

---

2. The Board of Public Disclosure, created under the Disclosure Law, consists of seven residents of Suffolk County, appointed by the County Executive with the approval of the County Legislature (Local Laws, 1978, No. 12 of Suffolk County, § 5, subd [a]). The board members may not hold "public office" or office in any political party during their term on the board (§ 5, subd [c]). They serve without compensation (§ 5, subd [d]).

The public official involved in this case was required to file a disclosure statement with the board on or before the 120th day after the initial appointment of its members, and on April 1 of each succeeding year of his employment (§ 8). The record does not indicate the date of the initial appointment of the members of the board.

at the end by which the employee is to certify by his or her signature that "to the best of [his or her] knowledge" the statement is "true, correct and complete". A jurat appears below the signature line of the attestation.

The law requires the board to "review all filed statements to determine whether a conflict of interest or impropriety exists between the public duties of the employee and his private activities" (Local Laws, 1978, No. 12 of Suffolk County, § 6, subd [c]). It is silent with respect to when or how often this review is to occur, or what kind of investigation, if any, is to precede the making of the board's determination.

The Disclosure Law further provides that an employee's continued refusal to file a statement or his filing of a fraudulent statement "shall be deemed a misconduct of office" and shall be grounds for dismissal or removal (§ 10, subd [a]). In addition, it contains the following provision (§ 10, subd [b]) with respect to criminal penalties. *"Criminal.* If any employee files a statement with the intent to deceive, intentionally misrepresent, or to otherwise fraudulently answer any question set forth in the statement, or to intentionally withhold any information asked or demanded in the statement, and if such deception or misrepresentation is found to be both intentional and material as defined in section 4(7) herein, then such employee shall, upon conviction, be guilty of a Class B Misdemeanor, punishable by a fine of not more than Five Hundred ($500.00) Dollars or imprisonment of not more than three (3) months or both. In all criminal proceedings, the Board, through a designated representative, shall act as the complaining witness."

The law also contains confidentiality provisions which, by their terms, severely restrict disclosure of the financial statement of any employee who does not consent thereto. Thus, section 3 of the law states the following as one of its four "legislative findings": "(4) All information obtained by the Board as hereinafter created, and not made public pursuant to this law, shall be considered confidential and any disclosure shall be an unwarranted invasion of

personal privacy under the meaning of the Freedom of Information Law."[3] An employee may waive his right to the confidentiality of his statement and authorize the board to file the statement with the Clerk of the Suffolk County Legislature, in which case the statement becomes "a matter of public record" (§ 7). However, if there has been no such waiver, under subdivision (d) of section 6 the board may make public an employee's statement or portions thereof only under the following circumstances: "Where the Board deems a conflict of interest or other impropriety adversely reflecting on the integrity of the county government does exist, and, if, in the sole opinion of the majority of the entire membership of the Board, such conflict warrants a public disclosure, the Board shall cause and direct only the relevant portions of the statement of the particular employee to be filed with the Clerk and the filing thereof shall constitute a public record to be made available to anyone who makes application to examine such record." Prior to any filing of a statement with the clerk, the board must state in writing its reasons for making a statement public and must afford the affected employee 21 days within which to respond to the board's stated reasons for public disclosure (§ 6, subd [e]). The board may, "in its discretion", apparently at any time and whether or not in reaction to an employee's response, rescind or modify its initial decision to disclose by a two-thirds vote of its membership (§ 6, subd [e]). Pending the receipt of a response of an employee and the final decision of the board, the board "shall not disclose any information to the Clerk or the public" (§ 6, subd [g]).

The law also provides that it shall be a "violation of the law" for a board member or other person to disclose any information contained on a disclosure statement "except as authorized by this local law." The violation of the law is

---

3. The other three stated "legislative findings" are as follows:

"(1) The citizens of Suffolk County desire and require accountability and candor of its government, more particularly those employees who perform responsible functions on behalf of the county government.

"(2) Any conflict of interest on the part of county employees is deleterious to the county government administration and credibility.

"(3) Those persons who hold county positions as hereinafter defined constitute a distinct class of county government employees whose public and personal affairs reflect upon and relate to the credibility and quality of government administration."

punishable by a fine of not more than $250, imprisonment of not more than 10 days, or both (§ 11).

The Disclosure Law was drawn into this case in the following way. Early in 1981, a Grand Jury impaneled in Suffolk County commenced an investigation into the facts and circumstances surrounding transactions between certain vendors and consultants and the Suffolk County Department of Labor. On or about May 11, 1981, the Grand Jury called as a witness respondent Lou V. Tempera, the commissioner of that department and, as such, its chief executive officer. Tempera testified without having waived immunity. By so testifying, he automatically received "transactional" immunity with respect to the subjects of his responsive testimony, but not with respect to the crimes of perjury and contempt (CPL 50.10, subd 1; 190.40, subd 2). On May 21, 1981, as a result of his testimony before it, the Grand Jury indicted Tempera on 11 counts of perjury in the first degree. The indictment alleged, among other things, that Tempera had given perjurious testimony before the Grand Jury in denying that he had ever received "cash money" from anyone employed by having an interest in, or representing an entity doing business with the Department of Labor or from any vendor or consultant with whom he had personally negotiated a contract between the vendor or consultant and the department. It also alleged that Tempera had committed perjury when he had denied that he had ever received "cash money" in excess of $10,000 in connection with the awarding of any "summer program" administered by the Suffolk County Department of Labor. Five other counts alleged Tempera's perjurious denial of his receipt of certain cash moneys "[i]n or about and between 1972 and 1978".

About one week after the Grand Jury had indicted Tempera for perjury, a subpoena duces tecum was served on its behalf upon the Suffolk County Board of Public Disclosure.[4] The subpoena demanded the production by the board of any financial disclosure statements that Tempera had filed with it "for the period of 1975 [sic] to present." In

---

4. The subpoena was delivered to William J. Kent, an Assistant County Attorney of Suffolk County who was characterized therein as "Custodian of the Records".

response, the board[5] moved to quash the subpoena, primarily on the ground that compliance therewith was barred by the confidentiality provisions of the Disclosure Law. More specifically, it was the position of the board that its records "have no relationship to criminal proceedings unless so determined by [it]." There was no allegation by the board that it had reviewed the subpoenaed documents or that, upon such review, it had determined that no "conflict of interest or other impropriety adversely reflecting on the integrity of the county government" existed within the meaning of subdivision (d) of section 6 of the Disclosure Law. The board also claimed in an accompanying memorandum of law that the records sought "can be considered testimony of the preparer or employee, and not records of the Board" and, without citing any specific constitutional provision, that production of the records "would be a violation of the doctrine of prohibition against compulsory production of a man's private papers to establish criminal charges against him as enunciated in *Boyd v U.S.,* 116 US 616, 622." By separate motion made five days later, respondent Tempera also moved to quash the subpoena duces tecum served upon the board.[6] His attorney, in an affirmation in support of the motion, argued that the subpoena should be quashed because it was being improperly used as a tool to prepare the pending perjury indictment for trial (see *Matter of Hynes v Lerner,* 44 NY2d 329), and because compliance with the subpoena would violate, among other things, Tempera's privilege against self incrimination under the Fifth Amendment and his right of confidentiality under the Disclosure Law. In an accompanying memorandum of law, Tempera also contended that compliance with the subpoena would violate his right to be free from un-

5. In particular, it was Kent who initiated the motion to quash. In addition, in his motion affidavit, he argued, among other things, that the custodian of the requested records was the Board of Public Disclosure, not he. However, another Assistant County Attorney submitted a separate affirmation in support of Kent's motion to quash, apparently on behalf of the board. Thereafter, that attorney, on behalf of the board, advised the County Court that any argument that "service was made on an improper person" was "withdrawn". Further, it is the board, and not Kent, who appears as a respondent on this appeal. Accordingly, for purposes of this appeal, we deem service upon Kent to be service upon the board and we refer to the motion initiated by Kent, but later joined in by the board, as the motion of the board.

6. The record does not reveal the manner in which Tempera received notice that the board had been served with the subpoena.

reasonable searches and seizures under the Fourth Amendment.[7] By his motion, Tempera sought nothing other than the quashing of the subpoena in its entirety. He did not contend that, if it were not quashed, the subpoena should be modified to direct the production of fewer than all the documents sought or only particular portions of them.

Over the People's opposition, the County Court granted respondents' consolidated motions to quash (110 Misc 2d 595, 606, *supra*).

In its decision, the County Court first addressed, and rejected, the Fifth Amendment claim which, it stated, had been raised by both respondents. The essence of the County Court's holding on this point (110 Misc 2d 595, 599, *supra*) was that since Tempera had neither actual nor constructive possession of the documents in question, requiring the board to produce them would not amount to "compell[ing] * * * [Tempera] to be a witness against *himself*" within the meaning of the Fifth Amendment (see *Couch v United States,* 409 US 322). Although the United States Supreme Court had allowed in *Couch* that "situations may well arise where * * * relinquishment of possession is so temporary and insignificant as to leave the personal compulsions upon the accused substantially intact" (*Couch v United States, supra,* p 333), the County Court concluded (p 598) that Tempera's submission of a financial statement to the board was "neither temporary nor insignificant" since "[t]he statement became a record of the Board which could not be retrieved by [Tempera]." Both respondents now expressly disavow any reliance upon the Fifth Amendment and, accordingly, no issue arising thereunder is before this court.

However, the County Court (p 599) found merit in Tempera's contention that the board's compliance with the subpoena would violate "his Fourth Amendment protections against unreasonable searches and seizures" and quashed the subpoena on that ground.

---

7. Neither movant invoked any provision of the New York Constitution. Although Tempera made a relatively brief reference to the First Amendment in his motion papers, he did not press any First Amendment claim at the County Court and does not even mention any such claim in his brief to this court.

In addition, the County Court, *sua sponte,* held that quashing of the subpoena was also required under what was described as the "public interest" privilege in *People v Keating* (286 App Div 150).

Because the County Court had quashed the subpoena under the Fourth Amendment and the "public interest privilege", it found it "unnecessary to reach [Tempera's] remaining contention" without identifying the nature of that contention.[8] (110 Misc 2d, at p 605.)

I.

■ Before turning to the claims of privilege advanced in this case, we first consider Tempera's contention that the subpoena in question was improperly issued for the "sole" or "dominant" purpose of preparing his pending perjury indictment for trial (see *Matter of Hynes v Lerner,* 44 NY2d 329, 333, *supra,*) a contention which was not passed upon by the County Court. Of course, if the subpoena were issued for such a purpose, then it should be quashed, without regard to whether compliance with it would be barred by any assertion of privilege. After due consideration, however, we have no difficulty in concluding in this particular case that "the purpose of the Grand Jury investigation is [properly] directed to other offenses" (*Matter of Hynes v Lerner, supra,* p 333). Indeed, this conclusion is almost compelled by our juxtaposition of the pending perjury indictment with the legally prescribed form of the financial disclosure statements sought by the Grand Jury.

From the face of the perjury indictment, it is apparent that the Grand Jury has received evidence which, in its view, establishes prima facie that Tempera has received cash from persons who had had dealings with the Suffolk County Department of Labor. The financial disclosure statement which Tempera was required to complete annually under the Disclosure Law requests, among other things, that the public official, under oath, "list * * * all sources of income for you and your spouse for the current

---

8. It appears that the County Court actually left undecided two of Tempera's contentions. These were that the subpoena had been improperly issued for the sole or dominant purpose of preparing the pending perjury indictment and that the Disclosure Law (Local Laws, 1978, No. 12 of Suffolk County), standing alone, required that the subpoena be quashed.

year" and also "provide the amounts of income if it is in excess of $1,000." When these documents are considered together, it becomes apparent that the financial disclosure statements completed by Tempera are relevant to the investigation of offenses other than Tempera's alleged perjury before the Grand Jury and any offenses for which he might have received transactional immunity by virtue of his Grand Jury testimony. As Tempera's attorney admitted in his affirmation at the County Court, the subpoenaed documents "clearly relate to financial documents and records (from which, by implication, the taking of bribes may be elicited)". By the same token, then, the documents are relevant to an investigation of improper payment of money to Tempera which might amount to the commission of crimes by the payors. In addition, if the Grand Jury believes that there is prima facie evidence that Tempera knowingly testified falsely under oath before it with respect to his receipt of cash money, it is well within the proper exercise of its powers to investigate whether he knowingly made false statements with respect to his receipt of income when he responded to similar questions in completing his financial disclosure statements. If he did, he may have thereby committed crimes punishable under State law. (See Penal Law, §§ 175.35, 175.30, 210.05, 210.10, 210.40, 210.35.)[9]

Our conclusion in this regard is supported in some respects by Judge SEIDELL's decision denying Tempera's motion to quash a postindictment Grand Jury subpoena duces tecum which sought production of certain of his bank records. That decision states as follows, in pertinent part: "Having reviewed the transcript of the Grand Jury minutes provided by the defense counsel and portions of the transcript of the Grand Jury proceedings forwarded by the District Attorney's office and after an In Camera hearing the Court finds that this Grand Jury * * * is * * * investigating other possible offenses in connection with certain contracts between vendors and the Suffolk County Department of Labor."

---

9. In addition, wholly apart from its function of gathering evidence of possible criminal offenses, the Grand Jury is empowered to submit a report "[c]oncerning misconduct, non-feasance or neglect in public office by a public servant as the basis for a recommendation of removal or disciplinary action" (CPL 190.85, subd 1, par [a]).

We denied Tempera's motion for a stay pending his appeal from the order entered on Judge SEIDELL's decision.

Finally, our own review of the minutes of the Grand Jury testimony taken before the issuance of the subpoena in question convinces us that the subpoena was not issued for an improper purpose.

Concededly, the subpoenaed statements might be of potential use to the People in establishing some of their allegations that Tempera committed perjury in his testimony before the Grand Jury. "However, where the purpose of the Grand Jury investigation is directed to other offenses, its scope should not be circumscribed and any collateral or incidental evidence from bona fide inquiries may be used by the prosecutor against the defendant at the trial of the pending indictment" (*Matter of Hynes v Lerner*, 44 NY2d 329, 333, *supra*).

Accordingly, absent any legally cognizable privilege, which may be asserted on behalf of Tempera or the board (see *Matter of New York State Dept. of Taxation & Fin. v New York State Dept. of Law, Statewide Organized Crime Task Force*, 44 NY2d 575; *Branzburg v Hayes*, 408 US 665, 688), there is no basis in the case upon which to quash the Grand Jury's subpoena duces tecum pursuant to respondents' motions.

II.

In our examination of the privileges asserted in this case, we turn first to the contention raised by both respondents at County Court, but only in the brief of the respondent board in this court, that the Disclosure Law, in and of itself, provides a proper basis for quashing the subpoena in question. As we read its decision, this issue was addressed by the County Court only to the extent that it held that the Disclosure Law was intended to bar the disclosure of the documents in question to the Grand Jury and that that law gave Tempera certain expectations which not only operated to trigger the protection of the Fourth Amendment, but also provided the basis for the application of the "public interest" privilege in his favor. We consider these holdings later. However, the County Court left unanswered the question whether the Disclosure Law, standing alone, is

proper authority for the quashing of the subpoena. We answer that question in the negative.

Although the Disclosure Law makes no reference to the Grand Jury or its proceedings, the County Court concluded that that law was intended to prohibit disclosure of financial statements pursuant to Grand Jury subpoena primarily because, while carefully spelling out the circumstances and procedure under which disclosure would be permissible, the law contained no express exception permitting disclosure in connection with judicial proceedings like those of the Grand Jury.

Preliminarily, we observe that we are not convinced beyond doubt that the Disclosure Law is properly construed as expressing the intent of the County Legislature to prohibit compliance with a Grand Jury subpoena seeking financial disclosure statements filed by county employees as part of an investigation into official corruption. The Grand Jury is possessed of investigative powers that are unique in their breadth. "Traditionally, our courts have afforded the Grand Jury the widest possible latitude in the exercise of [its] powers [to inquire into the commission of crimes] and insisted that in the absence of a clear constitutional or legislative expression they may not be curtailed" (*People v Stern,* 3 NY2d 658, 661). Thus, it has been held that the Grand Jury is not a "person" within the meaning of the provision of section 114 of the Domestic Relations Law that "[n]o person shall be allowed access to * * * sealed [adoption] records and order and any index thereof except upon an order of a judge or surrogate of the court in which the order was made or of a justice of the supreme court" (*Matter of Grand Jury Subpoenas [Morgenthau],* 58 AD2d 1).

Whether the Disclosure Law contains a "clear * * * legislative expression" by the county prohibiting compliance with a Grand Jury subpoena is open to question. Indeed, there is good reason to infer that the nondisclosure provisions of the law were addressed solely to the circumstances under which disclosure to the public at large would be permitted or not and that, therefore, those provisions were not intended to foreclose compliance with a subpoena of the Grand Jury, an arm of the courts whose proceedings

take place in secrecy (see CPL 190.25, subd 4). For example, subdivision 4 of section 3, a key nondisclosure provision, deems disclosure of any information "not made public" to be an "unwarranted invasion of personal privacy under the meaning of the Freedom of Information Law." However, the Freedom of Information Law limits only disclosure to the public and not to the Grand Jury (Public Officers Law, §§ 84, 87, subd 2; § 89, subd 5).[10] Similarly, subdivision (d) of section 6 of the Disclosure Law is expressly addressed only to circumstances under which public disclosure is authorized. Moreover, subdivision (g) of section 6 of the law expressly states that pending the board's final determination of whether a conflict of interest, exists, the board is barred from disclosing information only "to the Clerk [of the County Legislature] or the public."

Concededly, the law makes no reference to an exception in favor of disclosure in connection with Grand Jury or judicial proceedings. However, unlike the provisions of the Tax Law involved in *Matter of New York State Dept. of Taxation & Fin. v New York State Dept. of Law, Statewide Organized Crime Task Force* (44 NY2d 575, *supra*), the Disclosure Law does not contain any exceptions under which any other disclosure short of full public disclosure may be made. Thus, the law's failure to expressly set forth such an exception in favor of the Grand Jury is not necessarily dispositive.[11] Moreover, assuming that its application is fully appropriate here, "[t]he rule of construction that specific mention of one thing impliedly excludes others is not, however, anything more than an aid to construction and 'must not be utilized to defeat the purpose

10. We note that the Freedom of Information Law authorizes a governmental agency to deny to the public records that "are specifically exempted from disclosure by state or federal statute", but not by local law (Public Officers Law, § 87, subd 2, par [a]).

11. The terms of the Tax Law involved in *Matter of New York State Dept. of Taxation & Fin. v New York State Dept. of Law, Statewide Organized Crime Task Force* (44 NY2d 575), also differ from those of the Disclosure Law in that the former specifically foreclose disclosure "in any action or proceeding in any court" except under specified conditions, while the latter does not specifically foreclose such disclosure under any conditions. Further, since the number of persons who are expected to comply with the Disclosure Law is much smaller than the number of persons who are expected to comply with the Tax Law, and penal sanctions are available to enforce compliance, there is less reason to assume that the drafters of the Disclosure Law determined that Grand Jury access to disclosure statements should be limited in order to more fully foster frank self-reporting by county employees (see *Matter of New York State Dept. of Taxation & Fin., supra*, p 580).

of an enactment or to override the manifest legislative intent'" (*Matter of John P. v Whalen,* 54 NY2d 89, 96). The Disclosure Law contains no express statement of a policy which is directly furthered by noncompliance with a Grand Jury subpoena duces tecum issued in connection with an investigation into possibly corrupt activities by public officials. On the other hand, the law states that three policies of Suffolk County are "[t]o recognize that the citizens of Suffolk County are entitled to a high standard of candor from their public servants", "[t]o discourage and detect corruption and the appearance of corruption" and "[t]o instill in the public a sense of confidence and integrity and partiality [*sic*] of its public servants" (Local Laws, 1978, No. 12 of Suffolk County, § 2, subds [2], [4], [5]). It would appear that these policies are ill-served by refusal to comply with a subpoena duces tecum of the Grand Jury whose purposes and powers of investigation are much broader than those of the Board of Public Disclosure.[12]

However, we need not resolve the question of whether the Disclosure Law was intended by the County Legislature to prohibit compliance with a Grand Jury subpoena for the production of financial disclosure statements because, even if so intended, the Disclosure Law, being local in nature, cannot lawfully have that effect.

The Grand Jury derives its powers from the Constitution (NY Const, art I, § 6) and the laws of New York (CPL 190.05 *et seq.*) and from the common law. Since no person may be prosecuted for a felony without his consent except upon an indictment of the Grand Jury (NY Const, art I, § 6), the Grand Jury plays a fundamental role in the administration of our criminal justice system. It is defined

---

12. Of course, the mere fact that the Disclosure Law (Local Laws, 1978, No. 12 of Suffolk County) states that it is a class B misdemeanor for a county employee to intentionally file a materially false disclosure statement does not divest the Grand Jury of the power to investigate crimes defined in the Penal Law which also arise out of such a filing, most of which are more serious than a class B misdemeanor. In addition, although subdivision (b) of section 10 provides that the board shall act as the complaining witness "[i]n all criminal proceedings", this provision may reasonably be read as referring only to all criminal proceedings related to a prosecution for the crime defined in that section. To the extent that the provision refers to prosecutions for other crimes, it may reasonably be read as requiring merely that the board, rather than an individual member thereof, be the complaining witness and not that the board have exclusive power to initiate all criminal proceedings by bringing an employee's disclosure statement to the attention of the Grand Jury.

by statute as "a body * * * impaneled by a superior court and constituting a part of such court, the functions of which are to hear and examine evidence concerning offenses and concerning misconduct, nonfeasance and neglect in public office, whether criminal or otherwise, and to take action with respect to such evidence" (CPL 190.05).

As already indicated, because of its vital role in the administration of the laws of this State, the Grand Jury has traditionally enjoyed very broad investigatory powers (see *People v Stern,* 3 NY2d 658, *supra; People ex rel. Livingston v Wyatt,* 186 NY 383, 391-392; *Matter of Manning v Valente,* 272 App Div 358, 363-364, affd 297 NY 681).

As stated in *People ex rel. Livingston v Wyatt* (*supra,* pp 391-392): "[G]rand juries * * * are clothed by the common law with inquisitorial powers and, *of their own motion,* may make full investigation to see whether a crime has been committed, and if so, who committed it. They may investigate on their own knowledge, *or upon information of any kind derived from any source deemed reliable;* may swear witnesses generally and may originate charges against those believed to have violated the criminal laws." (Emphasis added.) Moreover, it has been stated that the Grand Jury may even act on rumor or suspicion (*People ex rel. Travis v Knott,* 204 App Div 379, 383).

Further, "[u]nlike searches and seizures, where a preliminary showing of probable cause is required before a warrant may issue, a Grand Jury is not saddled with such a requirement in issuing a subpoena duces tecum. To do so would assuredly impede its broad investigative powers to determine whether a crime has been committed and who has committed it." (*Matter of Hynes v Moskowitz,* 44 NY2d 383, 394.)

However, the powers of the Grand Jury to gather evidence are not unlimited. For one thing, they must "be exercised in accordance with the procedural and evidentiary rules laid down in the Criminal Procedure Law and other statutes" (*Matter of New York State Dept. of Taxation & Fin. v New York State Dept. of Law, Statewide Organized Crime Task Force,* 44 NY2d 575, 582, *supra*). Thus, in *Matter of New York State Dept. of Taxation & Fin. (supra),*

it was held that the nondisclosure provisions of subdivision (e) of section 697 of the Tax Law required the Department of Taxation and Finance to refuse to comply with a Grand Jury subpoena duces tecum for the production of an individual tax return where there was no allegation that the Grand Jury's investigation dealt with a violation of the Tax Law. The bar against production "in any action or proceeding in any court" unless under exceptional circumstances was held to bar production in Grand Jury proceedings under the circumstances of that case. Similarly, section 79-h of the Civil Rights Law expressly requires that the "grand jury" honor the newsman's privilege established by that provision. In addition, CPLR 4506 provides that there shall not be "received in evidence in any * * * proceeding before any * * * grand jury" the contents of any overheard or recorded communication or evidence derived therefrom which has been obtained by conduct constituting the crime of eavesdropping. Moreover, by operation of statute (see CPL 60.10, 190.30), the privileges that prohibit the introduction of certain types of evidence at civil and criminal trials in the courts of this State upon an assertion of privilege are also applicable to proceedings of the Grand Jury (see, e.g., *Matter of Priest v Hennessy,* 51 NY2d 62 [attorney-client privilege]; *Matter of Keenan v Gigante,* 47 NY2d 160 [priest-penitent privilege]; *People v McAlpin,* 50 Misc 2d 579 [physician-patient privilege]). However, all of the foregoing limitations upon the production of evidence before the Grand Jury are grounded in State law. The novel question presented in this case is whether the Grand Jury's power to compel the production of evidence before it may be limited by local law, where no comparable statutory limitation exists in State law.[13] We think not.

---

13. We are mindful that subdivision 1 of section 806 of the General Municipal Law provides that, as part of its effort to prevent conflicts of interest on the part of governmental employees, a county may by local law adopt a "code of ethics" which may, among other things, "provide for the prohibition of conduct or disclosure of information and the classification of employees or officers." However, apart from the fact that the Disclosure Law is not part of the Suffolk County "Code of Ethics", which was apparently enacted in 1968, we read this generally worded provision merely as authorizing the county legislature to require the filing of financial disclosure statements, but not to prohibit the Grand Jury from directly obtaining the information disclosed in the course of its proper investigation into possible official corruption and the integrity of the very statements themselves.

The "home rule" provisions of the State Constitution provide in pertinent part that: "[E]very local government shall have power to adopt and amend local laws not inconsistent with the provisions of this constitution or any general law relating to the following subjects, whether or not they relate to the property, affairs or government of such local government, except to the extent that the legislature shall restrict the adoption of such a local law relating to other than the property, affairs or government of such local government * * * (10) The government, protection, order, conduct, safety, health and well-being of persons or property therein." (NY Const, art IX, § 2, subd [c], par [ii], cl [10].)

However, a local law need not be inconsistent with a specific provision of the Constitution or a general law in order to run afoul of the "home rule" provision. As explained in *People v Cook* (34 NY2d 100, 109): "Any time that the State law is silent on a subject, the likelihood is that a local law regulating that subject will prohibit something permitted elsewhere in the State. That is the essence of home rule. A different situation is presented when the State has acted upon a subject, and in so acting has evidenced a desire that its regulations should pre-empt the possibility of varying local regulations. Under these circumstances a local law may be said to be inconsistent with State law because it prohibits something acceptable under the State law (e.g., *Wholesale Laundry Bd. of Trade* v. *City of New York,* 17 AD2d 327, 18 AD2d 968, affd. 12 NY2d 998)."

In the context of this case, the nondisclosure provisions of the Disclosure Law, as construed by the Board of Public Disclosure, may be fairly regarded as establishing a "qualified privilege" in favor of persons who file financial disclosure statements and do not consent to such statements being made public. Unless the board, in its sole discretion, determines that such a person is involved in a conflict of interest or other impropriety, his financial disclosure statements may be disclosed to no one. However, if the board determines that a conflict of interest or other impropriety does exist, then the statements may be made a

matter of public record. The "privilege" thus disappears in its entirety.

Whether and under what circumstances an asserted privilege will be recognized is generally regarded as a matter of the procedural and evidentiary law that governs the proceedings in the forum in which the privilege is asserted to apply. The nature of the Grand Jury, its powers, its proceedings, and the evidentiary rules to be applied therein are matters that have received extensive attention in the Criminal Procedure Law, in addition to other statutes such as those cited above. CPL 190.40 (subd 1) provides that "[e]very witness in a grand jury proceeding must give any evidence legally requested of him". CPL 60.10 provides that "[u]nless otherwise provided by statute or by judicially established rules of evidence applicable to criminal cases, the rules of evidence applicable to civil cases are, where appropriate, also applicable to criminal proceedings." CPL 190.30 (subd 1) provides that "the provisions of article sixty, governing rules of evidence and related matters with respect to criminal proceedings in general, are, where appropriate, applicable to grand jury proceedings." Considering the nature and function of the Grand Jury, we think that the extensive and specific attention paid by the State Legislature in these statutes to the procedural and evidentiary rules to be applied with respect to Grand Jury proceedings evidences a desire that those general rules "pre-empt the possibility of varying local regulations" (*People v Cook,* 34 NY2d 100, 109, *supra.*) We are fortified in this conclusion by the circumstances that, as illustrated by these statutes, the Legislature, where appropriate, had incorporated the procedural and evidentiary rules applied in civil and criminal cases into Grand Jury proceedings. The procedural and evidentiary rules to be applied in such cases appear to be beyond the reach of local lawmaking (see NY Const, art IX, § 3, subd [a], par [2]; art VI, § 30). Since the Grand Jury is an "arm of the court" (*Matter of Manning v Valente,* 272 App Div 358, 361, affd 297 NY 681, *supra;* see CPL 190.05), we think it was the desire of the Legislature that the rules to be applied in Grand Jury proceedings be on equal footing.

Under State statutes there is no bar in this case to the Grand Jury's obtaining the statements in question by subpoena as long as the statements are relevant to its proper investigation. However, the Disclosure Law, as construed by the board, prohibits production of disclosure statements, absent a discretionary determination by the board that they should be disclosed not merely to the Grand Jury, but to the public at large. Accordingly, the nondisclosure provisions of the Disclosure Law are inconsistent with the general laws defining the evidence-gathering powers of the Grand Jury and must yield to them.

We note that a similar result has obtained in cases in the Federal courts in which "the conflict between state confidentiality provisions and Congressional or constitutional investigatory powers has resulted in enforcement of federal grand jury subpoenas [under the supremacy clause] despite state statutes which would otherwise prohibit compliance. *Matter of Special April 1977 Grand Jury,* 581 F.2d 589 (7th Cir. 1978) [cert den 439 US 1046] * * * *In re Grand Jury Proceedings,* 563 F.2d 577 (3d Cir. 1977); *Matter of Grand Jury Impaneled January 21, 1975,* 541 F.2d 373 (3d Cir. 1976); *United States v. King,* 73 F.R.D. 103 (E.D.N.Y. 1976)" (*Matter of Grand Jury Subpoena for N.Y. State Income Tax Records,* 468 F Supp 575, 577; cf. *Matter of Grand Jury Subpoena, May, 1978 at Baltimore,* 596 F2d 630). For example, in *Matter of Grand Jury Subpoena for N.Y. State Income Tax Records (supra),* a Federal Grand Jury was permitted to subpoena the same type of records which had previously been denied to a New York Grand Jury under the confidentiality provisions of the Tax Law in *New York State Dept. of Taxation & Fin. v New York State Dept. of Law, Statewide Organized Crime Task Force* (44 NY2d 575, *supra*).

For these reasons we conclude that, as a matter of State law, it is only the State Legislature that can authorize the placing of the disclosure statements in issue beyond the reach of the Grand Jury.

III.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures".

The County Court agreed with Tempera's contention that the board's compliance with the subpoena duces tecum would violate his right under the Fourth Amendment to be free from unreasonable searches and seizures, even though the documents sought by the subpoena were owned and possessed by the board, and not Tempera. Proceeding from the proposition (110 Misc 2d 595, 599, *supra*) that a subpoena duces tecum "can constitute an unreasonable search and seizure", citing *Boyd v United States* (116 US 616, 622),[14] and applying a twofold test[15] to determine whether Tempera had an interest in the disclosure statements that was protected by the Fourth Amendment, the County Court stated its ultimate conclusion as follows (p 603): "Inasmuch as the local law created an expectation of privacy in [Tempera's] financial statement which [he] relied upon and inasmuch as the local law created an expectation of privacy in regard to the document which was reasonable,

---

14. We assume that the board's compliance with the Grand Jury subpoena duces tecum would amount to a "search" or "seizure" within the meaning of the Fourth Amendment, in line with *Boyd v United States* (116 US 616 [1886]). However, the validity of this assumption might be deserving of closer examination in light of the steady judicial erosion of other of the Fourth Amendment aspects of *Boyd* (see *Fisher v United States*, 425 US 391, 407; *United States v Miller*, 425 US 435, 440, n 1; *Oklahoma Press Pub. Co. v Walling*, 327 US 186, 195, 202, 208; *Hale v Henkel*, 201 US 43, 73, 76; *Matter of Horowitz*, 482 F2d 72, 75-79, cert den 414 US 867; see, generally, Note, The Life and Times of *Boyd v. United States* [1886-1976], 76 Mich L Rev 184). We take particular note of *United States v Dioniso* (410 US 1, 9) where it was held that a subpoena to appear before a Grand Jury and give a voice exemplar "is not a 'seizure' in the Fourth Amendment sense, even though that summons may be inconvenient or burdensome."

In this regard the differences between a search and the production of evidence in compliance with a Grand Jury subpoena duces tecum described in *Matter of Hynes v Moskowitz* (44 NY2d 383, 394), should be noted:

"Th[e] constitutional guarantee [against unreasonable searches and seizures] seeks to balance the interests of society in discovering evidence of criminal activity with the right of the individual to be free from unjustifiable governmental intrusions. To be sure, an intrusion imposed on a person subject to a search and seizure is substantial. A search is conducted without advance notice and the scene of the search may be an individual's home. Where resistance is encountered, the search may be effected by the threat or use of force. These considerations demand that a warrant issue only if supported by probable cause.

"But these considerations do not apply with equal force to the Grand Jury subpoena duces tecum. (*Hale v Henkel*, 201 US 43, 76.) It is served in the same manner as any other legal process, and may be challenged, before compliance, in a motion to quash. (*Matter of Manning v Valente*, 272 App Div 358, affd 297 NY 681; *United States v Doe* [*Schwartz*], 457 F2d 895, 898, cert den 410 US 941.) If the motion to quash is denied and compliance ordered, no search is conducted, nor is there a threat or actual use of force. (*Matter of B.T. Prods. v Barr*, 44 NY2d 226.) Rather the materials sought are furnished by the subpoenaed person himself at a time and place prescribed by the court."

15. The test applied by the County Court was first announced by Justice HARLAN in his concurring opinion in *Katz v United States* (389 US 347).

the court concludes that there exists a protected privacy right under the Fourth Amendment's proscriptions against unreasonable searches and seizures. Accordingly, the subpoena must be quashed."

In the course of its analysis, the County Court (110 Misc 2d, at p 601) noted its recognition that the United States Supreme Court "has held that a person having no proprietary interest in documents belonging to a third party cannot assert the Fourth Amendment to prevent their compelled production by the third party (see *United States v Miller,* 425 US 435 * * * *California Bankers Assn. v Schultz,* 416 US 21 * * * *Donaldson v United States,* 400 US 517)." However, the County Court distinguished those cases as follows (pp 601-602): "[T]he *ratio decidendi* underpinning these decisions is herein absent. The basis of these decisions is that a defendant can have no reasonable and legitimate expectation of privacy under the Fourth Amendment when he submits documents to a third party without an assurance of confidentiality. An examination of the facts of *Miller, California Bankers* and *Donaldson* reveals that the third party who was given the documents which were later subpoenaed was not legally bound to confidentiality and was free to disclose the contents to others. Such clearly is not the case here."

The County Court's discussion of this issue contained no reference to the Grand Jury's purpose or procedure in issuing the subpoena in question. Indeed, implicit in its decision was the conclusion that since Tempera had a legally cognizable expectation of privacy in the disclosure statements that he had filed with the board, any "search" or "seizure" of those statements would be "unreasonable" per se, regardless of not only the reason for the "search" or "seizure", but also the manner in which it occurred.

■ We do not agree with Tempera's contention that his Fourth Amendment right to be free from unreasonable searches and seizures requires that the Grand Jury subpoena served upon the Board of Public Disclosure be quashed. To the contrary, we are of the view that Tempera lacks "the Fourth Amendment interest necessary to entitle him to challenge the validity of the subpoena * * * *duces*

*tecum* through his motion to [quash]" (*United States v Miller,* 425 US 435, 439).

The starting point for our analysis is *United States v Miller* (*supra*). In that case, the United States Attorney's office issued allegedly defective Grand Jury subpoenas to two banks in which Miller maintained accounts. The subpoenas sought the production of records of Miller's accounts which the banks were required to keep under the Federal Bank Secrecy Act. Without protest or notice to Miller, the banks complied with the subpoenas and produced copies of the records, which were then used in the Grand Jury investigation of him. After his indictment by the Grand Jury, Miller moved to suppress the copies of the bank records. His motion was denied. Thereafter, copies of the records were admitted at his trial, at which he was convicted. On appeal, the Fifth Circuit Court of Appeals reversed defendant's conviction, holding that a bank depositor's Fourth Amendment rights were violated when bank records maintained pursuant to the Bank Secrecy Act are obtained by means of a defective subpoena (*United States v Miller,* 500 F2d 751). The Supreme Court reversed the Fifth Circuit's order, without reaching the issue of whether the subpoenas were defective, because of its conclusion that the defendant "had no protectable Fourth Amendment interest in the subpoenaed documents" (*United States v Miller,* 425 US 435, 437, *supra*).

In the first part of its analysis, the court observed that the subpoenaed documents were "the business records of the banks" over which Miller could "assert neither ownership nor possession" (425 US, at p 440). Accordingly, the documents were not, on their face, Miller's "private papers" and were, thus, seemingly unprotected by the Fourth Amendment. However, Miller, citing *Katz v United States* (389 US 347) asserted, that notwithstanding his lack of ownership or possession of the documents in question, he had a protectable Fourth Amendment interest in them because they were merely copies of personal records that were made available to the banks for a limited purpose and he had a legitimate expectation of privacy in them. Nevertheless, after examining the nature of the particular documents, the Supreme Court concluded that Miller had no

such expectation (425 US, at p 442). All of the documents obtained contained only information voluntarily conveyed to the banks and exposed to their employees in the ordinary course of business. Moreover, the court said (at p 443): "The depositor takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government. *United States* v. *White,* 401 U.S. 745, 751-752 (1971). This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed. *Id.,* at 752; *Hoffa* v. *United States,* 385 U.S. [293], at 302; *Lopez* v. *United States,* 373 U.S. 427 (1963)." The County Court distinguished the instant case from *Miller,* on the ground that under the twofold test enunciated by Justice HARLAN in *Katz v United States* (*supra*), Tempera has a "reasonable expectation of privacy" in the financial disclosure statements he filed with the board, arising out of the nondisclosure provisions of the Disclosure Law. That test was stated by Justice HARLAN as follows, in pertinent part: "[T]here is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" (389 US, at p 361.) Applying this twofold test,[16] we conclude that Tempera has no protected Fourth Amendment interest in the financial disclosure statements he filed with the Board of Public Disclosure. We do so because, even assuming, *arguendo,* that Tempera subjectively believed that the statements he filed would not be supplied by the board in response to a duly issued Grand Jury subpoena, despite the apparent absence of any competent evidence in the record to that effect,[17] we are of the

16. Although we follow the County Court's lead in applying this test, we note that *Katz* involved a warrantless intrusion into a public telephone booth occupied by the defendant and not a subpoena duces tecum seeking documents. We also observe that the *Miller* court, in a case involving a subpoena duces tecum seeking documents, did not specifically apply Justice HARLAN's test from *Katz,* even though it made other references to *Katz.*

17. Although the County Court's decision states (110 Misc 2d, at p 601) that Tempera "himself states, 'Without the Board's guarantee of secrecy, it is virtually beyond
*(n. contd.)*

view that any expectation of privacy he might have in them, vis-à-vis the Grand Jury, is not "one that society is prepared to recognize as 'reasonable'".

The County Court concluded that the second part of Justice HARLAN's test was met because Tempera's expectation of privacy was objectively reasonable, based as it was upon his reading of the "clear" language of the Disclosure Law, a legislative enactment. For the reasons already discussed, we question the objective reasonableness of any expectation by Tempera that the Disclosure Law shielded the statements he filed from production before the Grand Jury. However, even if Tempera's expectation of privacy was objectively reasonable, that is not enough to satisfy the second part of Justice HARLAN's test. Under that part, the expectation of privacy of a person who seeks to invoke the Fourth Amendment must not only be one that it would be objectively reasonable for that individual to hold, it must also be "one that society is prepared to recognize as 'reasonable'". As stated in *United States v White* (401 US 745, 751-752), a case different from, but analogous to, the case at bar: "Our problem is not what the privacy expectations of particular defendants in particular situations may be * * * Our problem, in terms of the principles announced in *Katz,* is what expectations of privacy are constitutionally 'justifiable' — what expectations the Fourth Amendment will protect in the absence of a warrant." This distinction has been summarized and illustrated by one commentator with the following example: "It is elementary that the term 'reasonableness,' as used in tort law, includes the concept of foreseeability. As applied to the expectation of privacy test, however, the term refers to the *justifiability* of the expectation. The following example illustrates the distinction between these concepts. Although it may be improbable, based on past experience, that a police officer with a flashlight will be strolling through a desolate corner of Central Park in the middle of the night, the expectation of privacy of narcotics peddlers who rely on this improbability by conducting an illegal transaction in that desolate corner is not justifiable." (Note, A *Reconsideration* of the *Katz* Expectation of Privacy Test, 76 Mich L Rev 154, 168,

---

question that [he] would have declined to bare his and his wife's personal finances in the manner requested'", this statement appears only in a memorandum of law submitted by Tempera's attorney.

n 64.) Thus, under circumstances closer to those at bar, it has been held that the mere fact that a State statute might have reasonably been read by savings and loan depositors as protecting their account records from being subpoenaed by a Federal Grand Jury, does not necessarily give rise to a protectable Fourth Amendment interest in the records (*United States v Grand Jury Investigation,* 417 F Supp 389).

Considering the facts and circumstances of this case, we conclude that any relevant expectation of privacy that Tempera had in the documents in question is not "one that society is prepared to accept as 'reasonable'". It bears emphasis that Tempera could have had no reasonable expectation that the Board of Public Disclosure would never make the statements he filed public, and, thus, available not only to the Grand Jury but also to anyone else who wished to examine them. Under even his construction of the Disclosure Law, the board, in its sole discretion, is authorized to make those statements public in their entirety if it deems such disclosure appropriate after giving Tempera an opportunity to contest disclosure. Thus, the expectation of privacy that would be disappointed if the board were to comply with the Grand Jury's subpoena in this case is merely that it will have done so without its first having determined to its satisfaction and in accordance with its procedure that there was a conflict of interest or other impropriety warranting disclosure of the statement to the public. However, such an expectation is not one that society is prepared to accept as reasonable in light of the limited nature of the purposes and powers of the Board of Public Disclosure compared with those of the Grand Jury.

The Grand Jury occupies no lesser place within the Federal constitutional scheme than it does within the criminal justice system of our State (see *Branzburg v Hayes,* 408 US 665, *supra,* especially pp 686-688, and cases cited therein). As in our State, the Grand Jury is a Federal constitutional institution, the Fifth Amendment providing that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury". Similarly, the powers and purposes of the Grand Jury are accorded no lesser recognition under the Federal Constitution than they are under

the Constitution of our State. Thus, in *Branzburg v Hayes* (*supra,* p 701), the Supreme Court stated: "The role of the grand jury as an important instrument of effective law enforcement necessarily includes an investigatory function with respect to determining whether a crime has been committed and who committed it. To this end it must call witnesses, in the manner best suited to perform its task. 'When the grand jury is performing its investigatory function into a general problem area * * * society's interest is best served by a thorough and extensive investigation.' *Wood* v. *Georgia,* 370 U.S. 375, 392 (1962). A grand jury investigation 'is not fully carried out until every available clue has been rundown and all witnesses examined in every proper way to find if a crime has been committed.' *United States* v. *Stone,* 429 F.2d 138, 140 (CA2 1970). Such an investigation may be triggered by tips, rumors, evidence proffered by the prosecutor, or the personal knowledge of the grand jurors."

In *United States v Calandra* (414 US 338, 345), that court also declared: "The duty to testify has long been recognized as a basic obligation that every citizen owes his Government * * * '[T]he longstanding principle that "the public * * * has a right to every man's evidence" * * * is particularly applicable to grand jury proceedings.' The duty to testify may on occasion be burdensome and even embarrassing. It may cause injury to a witness' social and economic status. Yet the duty to testify has been regarded as 'so necessary to the administration of justice' that the witness' personal interest in privacy must yield to the public's overriding interest in full disclosure."

Moreover, under the Federal Constitution, like our State Constitution, "a Grand Jury is not saddled with * * * a [probable cause] requirement in issuing a subpoena duces tecum" (*Matter of Hynes v Moskowitz,* 44 NY2d 383, 394, *supra;* see *United States v Miller,* 425 US 435, 446, n 8, *supra*).

Similarly, it is constitutionally unreasonable to effectively condition compliance with a Grand Jury subpoena upon a determination by a local agency that the documents sought are relevant to the Grand Jury's investigation. This is particularly true, in the context of this case, with respect

to the Board of Public Disclosure. There is nothing in the record to indicate that, as a general matter, a determination by the board of whether a conflict of interest exists is based on anything more than its review of the information contained within the four corners of the disclosure statement filed by the employee. Indeed, the Disclosure Law gives the Board of Public Disclosure no investigative powers at all. Further, in this case there is nothing in the record to indicate that the board has even discharged its duties under the Disclosure Law. In addition, even if the board determines that a conflict of interest does exist, it is not required to make public the disclosure statement of the affected employee (see Local Laws, 1978, No. 12 of Suffolk County, § 6, subd [d]). Finally, it does not follow from a determination that no conflict of interest exists that the disclosure statement is irrelevant to the proper purposes of the Grand Jury.

In sum, we do not think that society is prepared to accept as reasonable an expectation by a public official that the Grand Jury may not properly obtain documents filed by him that are relevant to its investigation of possible corruption in public office, merely because a locally created, nonjudicial agency has not had occasion to determine, in accordance with its relatively limited powers and purposes, that circumstances exist that require disclosure of the documents to the public at large. This is particularly true where the documents might constitute the very instrumentalities of crimes under investigation.

Although we need not resolve the issue, we note in passing that, even if the Fourth Amendment were applicable, it is unclear that the board's compliance with the Grand Jury subpoena duces tecum would amount to an "unreasonable" search or seizure under the facts and circumstances of this case. As was recognized in *Katz*, even if a zone of privacy is protected by the Fourth Amendment, it may be properly intruded upon as long as the intrusion is not "unreasonable" (see *Katz v United States,* 389 US 347, 354-359, *supra*). Concededly, in *Boyd v United States* (116 US 616, *supra*), the Supreme Court indicated that there are some documents which, by their nature, can never be the object of a "reasonable" search or seizure. However, in

the later case of *Warden v Hayden* (387 US 294, 303 [1967]), the court left open the question "whether there are items of evidential value whose very nature precludes them from being the object of a reasonable search and seizure". Then, in *Andresen v Maryland* (427 US 463), the court seemed to answer the question in the negative.[18]

Nor need we decide whether the disclosure statements that Tempera filed pursuant to the Disclosure Law are "records required by law to be kept in order that there may be suitable information of transactions which are the appropriate subjects of governmental regulation and the enforcement of restrictions validly established" (see *Wilson v United States,* 221 US 361, 380; *Davis v United States,* 328 US 582, 589-590; see, also, *Shapiro v United States,* 335 US 1) rather than private papers of Tempera and, consequently, entitled to only minimal protection from search or seizure under the Fourth Amendment.

IV.

In addition to quashing the subpoena on Fourth Amendment grounds, the County Court also held, *sua sponte,* that the "public interest" privilege described in *People v Keating* (286 App Div 150, *supra*), required that the Grand Jury subpoena duces tecum be quashed. The Court of Appeals has explained the nature of this privilege as follows:

"As part of the common law of evidence, 'official information' in the hands of governmental agencies has been deemed in certain contexts, privileged. Such a privilege

18. Thus one commentator has concluded, albeit somewhat reluctantly that "in light of *Andresen* and *Fisher* [*v United States,* 425 US 391], *Boyd* is dead. No zone of privacy now exists [under the Fourth or Fifth Amendments] that the government cannot enter to take an individual's property for the purpose of obtaining incriminating information. In most cases, the zone can be entered by the issuance of a subpoena; in the rest, it can be breached by a search warrant." (Note, The Life and Times of *Boyd v. United States* [1886-1976], 76 Mich L Rev 184, 211.)

It is quite evident that to the extent that the disclosure statements in question are exclusively records of the board, their production would not amount to an "unreasonable" search or seizure. In this context, records of the board are hardly different from corporate records. As to the limits the Fourth Amendment places upon a subpoena duces tecum for the production of corporate records, the Supreme Court has held that "the Fourth [Amendment], if applicable, at the most guards against abuse only by way of too much indefiniteness or breadth in the things required to be 'particularly described'" (*Oklahoma Press Pub. Co. v Walling,* 327 US 186, 208; see, also, *Matter of Hynes v Moskowitz,* 44 NY2d 383, 394). The subpoena at bar is neither indefinite nor overbroad, except to the extent that it seeks financial disclosure statements for 1975 through 1977, which obviously do not exist.

attaches to 'confidential communications between public officers, and to public officers, in the performance of their duties, where the public interest requires that such confidential communications or the sources should not be divulged.' (*People* v. *Keating,* 286 App. Div. 150, 153 * * *.) The hallmark of this privilege is that it is applicable when the public interest would be harmed if the material were to lose its cloak of confidentiality * * * It has been said that the privilege is a qualified one, which may be ineffective when it appears that the disclosure of the privileged information is necessary to avoid the risk of false testimony or to secure useful testimony. (See *People* v. *Keating, supra,* at p. 153.) * * *

"[W]e do not hold that all governmental information is privileged or that such information may be withheld by a mere assertion of privilege. There must be specific support for the claim of privilege. Public interest is a flexible term and what constitutes sufficient potential harm to the public interest so as to render the privilege operable must of necessity be determined on the facts of each case. Such a determination is a judicial one and requires that the governmental agency come forward and show that the public interest would indeed be jeopardized by a disclosure of the information. Otherwise, the privilege could be easily abused, serving as a cloak for official misconduct." (*Cirale v 80 Pine St. Corp.,* 35 NY2d 113, 117-119.)

In our view, this privilege is inapplicable in this case because it has not been demonstrated that the public interest requires that the contents of the statements Tempera filed with the board not be divulged to the Grand Jury. Some of our reasons for this conclusion have already been set forth. In addition, we are unconvinced that prohibiting the Grand Jury from compelling the production of financial disclosure statements of public officials, which are relevant to an investigation into official misconduct, is necessary in order to achieve full and frank financial disclosure by public officials or permit the Board of Public Disclosure to perform its function (cf. *Fischer v Citizens Committee,* 72 Misc 2d 595, affd 42 AD2d 692). Indeed, doing so would be detrimental to the public interest in that it would serve to insulate from sanction those who inten-

tionally file false financial disclosure statements (see *Matter of Housing Auth.,* 107 Misc 2d 1015, 1017). We note in this regard that in instances where the Legislature or the Executive has required members of those departments to file financial disclosure statements, neither has thought it necessary to shield such statements from disclosure to the Grand Jury or even to the public at large (see Public Officers Law, § 73, subd 6; 9 NYCRR 3.10).

TITONE, J. P., RABIN, GULOTTA and O'CONNOR, JJ., concur.

Order of the County Court, Suffolk County, dated August 17, 1981, reversed, on the law, without costs or disbursements, and motions to quash denied.