*515 OPINION OF THE COURT
Chief Judge Wachtler.
In this case, we consider whether Federal regulation of workplace safety under the Occupational Safety and Health Act of 1970 (29 USC § 651 et seq.) (the Act) preempts New York’s efforts to punish culpable employer conduct under its general criminal laws. We conclude that the Act does not expressly or impliedly preempt State prosecution of employers whose criminal activity happens to be centered in the workplace or directed against employees. The order of the Appellate Division reinstating the jury’s guilty verdict against these defendants should therefore be affirmed.
L
The corporate defendants Pymm Thermometer Corporation (PTC) and Pak Glass Machinery Corporation (Pak Glass) are domestic corporations that operate on two separate floors of the same Brooklyn building. PTC, which is located on the second floor, manufactures thermometers for clinical use, while Pak Glass, located on the ground floor, services and repairs the machinery used by PTC. Defendant William Pymm was vice-president of both corporations from 1981 to 1984 and has been their president since 1984. Defendant Edward Pymm, Jr. holds the title of vice-president and has served as plant manager for both operations since 1981.
Mercury contamination has been an ongoing problem at PTC, posing a serious health risk to PTC’s employees. The mercury used to fill the thermometers, although a liquid at normal temperatures, readily evaporates into the surrounding air. Once inhaled, mercury vapor passes from the lungs into *516 the bloodstream and is then circulated throughout the rest of the body, including the brain. Mercury can also enter the body through breaks in the skin, or can be ingested by eating food that has come in contact with mercury or by failing to wash mercury-contaminated hands before eating. Mercury vapor is highly toxic and long-term exposure to low concentrations of mercury can result in permanent neurological damage. Victims of mercury poisoning experience restlessness, sleeplessness, loss of appetite, faltering gait, tremor of the hands, unsteadiness, difficulty in concentrating, and memory loss.
A number of inspections dating back to the early 1970’s revealed that workers at PTC’s second floor manufacturing facility were not adequately protected from the dangers of mercury poisoning. Before the enactment of the Act, the Division of Industrial Hygiene of the State Department of Labor monitored workplace safety at PTC by conducting semiannual inspections of the PTC plant. In 1975, the Occupational Safety and Health Administration (OSHA). assumed responsibility for workplace safety. OSHA conducted four inspections of the facility between 1981 and 1984. These inspections revealed hazardous working conditions in the second floor manufacturing area. Workers did not wear protective gear, such as gloves or respirators, and the workplace was dangerously contaminated with mercury. Both William and Edward Pymm were warned of the dangers of mercury poisoning and were encouraged to adopt measures that would minimize the possibility of workers either ingesting liquid mercury or inhaling mercury vapors. PTC was twice cited by OSHA as a result of the workplace conditions observed on the second floor.
In 1985, OSHA learned that PTC was operating a clandestine mercury reclamation operation in the basement of the building. The defendants had omitted the basement area from any of the earlier inspections, despite the fact that OSHA inspectors had asked to see all of the area in which mercury was being used. When OSHA agents first confronted William Pymm about the reclamation facility, he denied that it even existed. Testimony at trial established that PTC had been recovering the mercury from broken thermometers since 1983. Vidal Rodriguez, a PTC employee since 1981, testified that he had fed the broken thermometers into a glass crusher as part of the reclamation process. The machine ground the thermometers, releasing the mercury, which was passed into a filtra *517 tion trough, separated and collected. An initial inspection of the reclamation operation had revealed boxes loaded with broken thermometers piled against the walls with mercury seeping out of the boxes and leaking out onto the floor. Readings taken at this time revealed mercury vapor readings almost five times the level permitted by OSHA. Although the cellar was almost entirely without ventilation, Rodriguez for the first several months was without a respirator and only later was given a single respirator to be shared with another worker. In 1984, physicians examining Rodriguez noticed that he had developed neurological symptoms that were consistent with mercury poisoning. Experts testifying at trial attributed these abnormalities, including damage to Rodriguez’s brain, to long-term exposure to mercury.
Defendants were charged with conspiracy in the fifth degree (Penal Law § 105.05 [1]); falsifying business records in the first degree (Penal Law § 175.10); assault in the first degree (Penal Law § 120.10 [4]); assault in the second degree (Penal Law § 120.05 [4]); and reckless endangerment in the second degree (Penal Law § 120.20). The jury found the defendants guilty of all counts in the indictment. The Trial Justice set aside the verdict, holding that the State prosecution was preempted by the Federal Government’s regulation of workplace safety under the Act. Additionally, the Trial Justice ruled that the evidence was legally insufficient to support the conspiracy and reckless endangerment counts of the indictment. The Appellate Division reversed, and we now affirm.
IL
The Act was enacted "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions” (29 USC § 651 [b]). In declaring the purposes behind the Act, Congress also noted the importance of encouraging employers "to reduce the number of occupational safety and health hazards at their places of employment, and * * * to institute new and to perfect existing programs for providing safe and healthful working conditions” (29 USC § 651 [b] [1]). The Act directs the Secretary of Labor to promulgate health and safety standards for the workplace (see, 29 USC § 655) and authorizes the Secretary to conduct inspections and investigations to ensure that employers are complying with these standards. Section 5 requires employers to comply with all standards promulgated by the Secretary of *518 Labor and additionally imposes a general duty to "furnish to [employees] employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees” (Pub L 91-596, §5 [a] [1], 29 USC §654 [a] [1]). The Act was not enacted for the principal purpose of punishing employers for workplace deaths or injuries; rather, "[i]t authorizes the promulgation of health and safety standards and the issuance of citations in the hope that these will act to prevent deaths or injuries from ever occurring.” (Whirlpool Corp. v Marshall, 445 US 1,12.)
The Act provides for both civil and criminal penalties for certain types of violations. These are spelled out in section 17 (Pub L 91-596, § 17, 29 USC § 666). In brief, willful or repeat violations of either a standard or of the general duty to provide a safe workplace are punishable by a civil penalty of not more than $10,000 (29 USC § 666 [a]). Serious violations are punishable by a civil penalty of up to $1,000 for each violation (29 USC § 666 [b]). A serious violation exists "if there is a substantial probability that death or serious physical harm could result from a condition which exists, or from one or more practices, means, methods, operations, or processes which have been adopted or are in use, in such place of employment” (29 USC § 666 [k]). Willful violations leading to the death of an employee are punishable, after conviction, by criminal fines and up to six months’ imprisonment.
Section 18 addresses State jurisdiction over occupational health and safety issues (29 USC § 667). Section 18 (a) provides that a State is free to assert jurisdiction over such an issue if there is no Federal standard already in effect (Pub L 91-596, § 18 [a], 29 USC § 667 [a]). Section 18 (b) permits each State to submit its own plan for the development and enforcement of workplace health and safety standards to the Secretary of Labor for approval. If the State plan is approved, the State can reassume responsibility over workplace issues that are already the subject of Federal standards (29 USC § 667 [b]). The Secretary cannot approve the State plan unless it is "at least as effective in providing safe and healthful employment and places of employment” as the Federal standard already in place (29 USC § 667 [c] [2]).
The Act also contains a savings clause that addresses the continued viability of State statutory and common-law duties and liabilities in light of the comprehensive Federal regula *519 tory scheme contained in the Act. Section 4 (b) (4) provides: "[n]othing in this Act shall be construed to supersede or in any manner affect any workmen’s compensation law or to enlarge or diminish or affect in any other manner the common law or statutory rights, duties, or liabilities of employers and employees under any law with respect to injuries, diseases, or death of employees arising out of, or in the course of, employment.” (Pub L 91-596, § 4 [b] [4], 29 USC § 653 [b] [4].)
Ill
The appellants argue that the Act’s extensive scheme for regulation of occupational health and safety preempts State enforcement of general criminal laws to punish conduct that arises out of an employer’s failure to provide his employees with a safe workplace. It is a well-established principle that the Supremacy Clause of the United States Constitution (art VI, cl 2) invalidates State laws that "interfere with, or are contrary to” Federal law (Gibbons v Ogden, 9 Wheat [22 US] 1, 211). State laws can be preempted by Federal regulations as well as by Federal statutes (see, e.g., Hillsborough County v Automated Med. Labs., 471 US 707, 713). Federal law can preempt State law in one of three ways (see, Simpson Elec. Corp. v Leucadia, Inc., 72 NY2d 450, 455). First, Congress can enact legislation that expressly preempts State law by stating this intention in explicit language (see, Jones v Rath Packing Co., 430 US 519, 525). Second, "[a]bsent explicit pre-emptive language, Congress’ intent to supersede state law altogether may be inferred because '[t]he scheme of federal regulation [is] so pervasive as to make reasonable the inference that Congress left no. room for the States to supplement it,’ because 'the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject,’ or because 'the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose.’ ” (Fidelity Fed. Sav. & Loan Assn. v De la Cuesta, 458 US 141, 153, quoting Rice v Santa Fe Elevator Corp., 331 US 218, 230.) Finally, State law will be preempted by Federal law to the extent that it actually conflicts with Federal law (see, Pacific Gas & Elec. v Energy Resources Commn., 461 US 190, 204; Fidelity Fed. Sav. & Loan Assn. v De la Cuesta, 458 US, at 153). A conflict may arise if "compliance with both federal and state regulations is a physical *520 impossibility” (Florida Avocado Growers v Paul, 373 US 132, 142-143), or if State law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.” (Hines v Davidowitz, 312 US 52, 67; see also, Capital Cities Cable v Crisp, 467 US 691, 706; Michigan Canners & Freezers v Agricultural Bd., 467 US 461, 478.)
As a preliminary matter, we note that "[wjhere * * * the field which Congress is said to have pre-empted has been traditionally occupied by the States * * * 'we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.’ ” (Jones v Rath Packing Co., 430 US, at 525, quoting Rice v Santa Fe Elevator Corp., 331 US 218, 230, supra; see also, Hillsborough County v Automated Med. Labs., 471 US, at 715; Auto Workers v Wisconsin Bd., 351 US 266, 273, n 11, quoting Allen-Bradley Local v Wisconsin Bd., 315 US 740, 748-749.) As the United States Supreme Court has stated, "[t]he States are the natural guardians of the public against violence * * * [w]e would not interpret an act of Congress to leave [local communities] powerless * * * without compelling directions to that effect.” (Auto Workers v Wisconsin Bd., 351 US, at 274-275.)
Despite the fact that Federal preemption of State criminal law will not be presumed, the appellants argue that their prosecution under New York’s Penal Law is both expressly and impliedly preempted by the Act. We will consider each of these contentions in turn.
Appellants argue that section 18 of the Act expressly preempts the application of State criminal law to workplace conditions that are already subject to a Federal standard. As noted above, section 18 (b) permits States to assume responsibility for the regulation of occupational health and safety issues by submitting a plan to the Secretary of Labor for approval. Appellants contend that because the State of New York has not submitted a plan to the Secretary, the criminal prosecution at issue here is impermissible standard-setting that is expressly preempted by the Act.
Section 18 (b), however, relates only to the development and enforcement of standards, and does not speak to State enforcement of general criminal laws. The Act defines "occupational safety and health standard” as "a standard which requires conditions, or the adoption or use of one or more practices, means, methods, operations, or processes, reasonably *521 necessary or appropriate to provide safe or healthful employment and places of employment” (29 USC § 652 [8]). We do not believe that New York’s general criminal laws are occupational safety and health standards as this term is used in the Act. They do not "require conditions, or the adoption or use of * * * practices, means, methods, operations, or processes.” While OSHA standards are prophylactic measures that are intended to prevent workplace accidents from ever occurring (see, Whirlpool Corp. v Marshall, 445 US 1, 12, supra), the criminal laws of this State are triggered only after the commission of certain acts that society as a whole deems unacceptable, wherever they may occur. State criminal prosecutions lead to the imposition of penalties that reflect society’s condemnation of behavior in violation of generally accepted norms (see, People v Pymm, 151 AD2d 133, 139; Note, Getting Away With Murder: Federal OSHA Preemption of State Criminal Prosecutions for Industrial Accidents, 101 Harv L Rev 535, 543). While necessarily reactive in effect, the general criminal laws of this State also serve to deter conduct that society has labeled intolerable and morally repugnant, and in this way protect every citizen of the State. Because the Penal Law protects all citizens, including workers, and because it punishes as well as deters, we believe that the purposes behind its enforcement, while certainly consistent with the development and enforcement of OSHA standards, are sufficiently separate to warrant its continued viability in the Federally regulated workplace. In addition, we believe that the very existence of section 4 (b) (4), which preserves State common-law and statutory rights, duties and liabilities, indicates that Congress did not intend the provisions permitting retention and assumption of State jurisdiction over workplace issues to preempt the enforcement of State criminal laws. Therefore, having considered the broad language of the savings clause together with the presumption against preemption discussed earlier, we conclude that section 18 of the Act does not expressly preempt the enforcement of New York’s Penal Law.
Appellants also argue that the State prosecution is impliedly preempted in two ways: first, because Federal regulation occupies the field of occupational health and safety; and second, because enforcement of State criminal law is in conflict with the Act’s comprehensive scheme for workplace regulation. They contend that the penalties imposed here are inconsistent with the penalty scheme contained in the Act and violate Congress’ intent that the penalties contained in the *522 Act be exclusive. In addition, they argue that uniformity of workplace regulation was the primary focus of the Act and that individual State prosecutions undermine this goal, thereby conflicting with the Federal regulatory scheme. Neither of these contentions has merit.
In reaching our conclusion that Federal regulation of occupational health and safety does not occupy the field, we note first that the comprehensiveness of a Federal statute or regulation does not necessarily indicate that Congress intended it to have preemptive effect. In New York Dept. of Social Servs. v Dublino, the United States Supreme Court stated that "[t]he subjects of modern social and regulatory legislation often by their very nature require intricate and complex responses from the Congress, but without Congress necessarily intending its enactment as the exclusive means of meeting the problem” (413 US 405, 415).
The Act explicitly encourages States to "assume the fullest responsibility for the administration and enforcement of their occupational safety and health laws” (29 USC § 651 [b] [11]). This alone would seem to indicate that Congress believed States should have a continuing role in the oversight of occupational health and safety concerns. Our reading of the detailed provisions for the retention and assumption of State jurisdiction over workplace issues contained in section 18 further convinces us that Congress did not intend to fill the field and preempt State regulation. Rather, it is clear that Congress intended to foster continuing State oversight over the workplace by ensuring that States would continue to exercise jurisdiction where there was no Federal standard in place and by providing that States could decide to reassert jurisdiction and impose stricter health and safety standards than those already in place by submitting a State plan to the Secretary of Labor. Section 18 carefully balances the continued importance of a State’s interest in regulating workplace concerns against the need for minimum standards that ensure some level of employee health and safety.
While enforcement of the State’s Penal Law in the context of workplace safety will necessarily touch upon conduct that is already subject to Federal regulation under the Act, we do not find that this is impermissible or even undesirable. State prosecution of cases such as this one may cause employers to pay stricter attention to the standards promulgated by OSHA. This we find to be entirely consistent with the Act’s self- *523 proclaimed purpose — ensuring "safe and healthful working conditions” for American workers.
Our decision here is also consistent with the United States Supreme Court’s holding in Silkwood v Kerr-McGee Corp. (464 US 238). In Silkwood, the court considered whether its earlier holding that Congress had intended the Federal Government to occupy the entire field of nuclear safety (Pacific Gas & Elec. v Energy Resources Commn., 461 US 190, 212, supra) prevented an Oklahoma jury from awarding punitive damages for injuries caused by exposure to radiation at the workplace. Kerr-McGee argued that because the State-authorized award of punitive damages punished and deterred conduct related to radiation hazards, it fell within the Federally regulated field and was therefore preempted (464 US, at 249). The Supreme Court held that the award of punitive damages was not so preempted. "[I]t is clear that in enacting and amending the Price-Anderson Act, Congress assumed that state-law remedies, in whatever form they might take, were available to those injured by nuclear incidents. This was so even though it was well aware of the NEC’s exclusive authority to regulate safety matters. No doubt there is tension between the conclusion that safety regulation is the exclusive concern of the federal law and the conclusion that a State may nevertheless award damages based on its own law of liability. But as we understand what was done over the years in the legislation concerning nuclear energy, Congress intended to stand by both concepts and to tolerate whatever tension there was between them. We can do no less. It may be that the award of damages based on the state law of negligence or strict liability is regulatory in the sense that a nuclear plant will be threatened with damages liability if it does not conform to state standards, but that regulatory consequence was something that Congress was quite willing to accept.” (464 US, at 256.) The case now before us presents similar concerns. The appellants here are arguing that State criminal prosecutions are preempted by the Act because they would tend to regulate conduct already subject to pervasive Federal regulation. The Supreme Court in Silkwood expressly rejected this reasoning, despite the fact that it had already held that State regulation of nuclear safety issues was preempted. The court examined the legislative history of the Price-Anderson Act and saw in it no intent to foreclose the availability of State law remedies. Similarly, our examination of the Act, especially the express language of section 4 (b) (4), leads us to conclude that Congress *524 intended State law statutory and common-law duties, rights and liabilities to survive, and that Congress was willing to tolerate any tension that resulted.
It is true that the Act contains limited civil and criminal penalties for willful and repeated violations of standards or of the general duty to provide a safe workplace. That these penalties are so skeletal, however, argues against their being considered preemptive of State criminal law. While the Act imposes criminal liability for willful violations leading to the death of an employee, there is currently no provision for violations leading to serious injury. Given that promotion of worker health and safety is the primary goal of the Act, it would make absolutely no sense to hold that employers who engage in willful criminal conduct, which coincidentally constitutes a violation of an OSHA standard or of the Act’s general duty clause, should be insulated from criminal prosecution simply because the culpable conduct leads to serious injury and not death. Instead, we believe that the Act’s penalties operate as a floor and that States can supplement these penalties with sanctions authorized by their own criminal laws (see, People v Hegedus, 432 Mich 598, 620, 443 NW2d 127, 137; People v Chicago Magnet Wire Corp., 126 111 2d 356, 368-369, 534 NE2d 962, 967, cert denied sub nom. Asta v Illinois, — US —, 110 S Ct 52; Note, Getting Away With Murder: Federal OSHA Preemption of State Criminal Prosecutions for Industrial Accidents, op. cit, at 548). As noted earlier, because criminal laws are not occupational health and safety standards, States need not comply with section 18 before being able to prosecute and impose criminal sanctions.
Having concluded that Federal regulation of workplace safety does not occupy the field, we next consider appellants’ arguments that State enforcement of criminal laws in the workplace conflicts with the Federal scheme and is preempted for that reason. We do not accept the appellants’ argument that Congress’ foremost purpose in drafting the Act was to ensure uniformity of workplace health and safety standards and that individual State prosecutions stand as an obstacle to the accomplishment of that purpose. The Act’s detailed provisions for the exercise of State jurisdiction over workplace concerns, when considered together with the savings clause, indicate to us that Congress was willing to accept a multiplicity of regulatory approaches provided that the safety and health of workers were not compromised. We believe that Congress’ concern was not uniformity per se; rather, it was *525 ensuring a minimum level of workplace safety that individual States could supplement through the submission and approval of their own regulatory plans. Our reading of the Act is borne out by the legislative history of this statute (see, 116 Cong Rec 38,392 [statement of Rep Karth]; 116 Cong Rec 37,325 [statement of Sen Williams]; 116 Cong Rec 36,521 [statement of Sen Saxbe]), which reveals that Federal lawmakers were concerned in part about the "race for the bottom” that occurred when States were responsible for setting their own occupational health and safety standards. Members of Congress, noting the inadequacy of most State efforts to regulate occupational health and safety, observed that there were distinct economic disadvantages attached to aggressive State regulation of occupational health and safety issues. Because States that adopted stringent workplace standards would lose industry to States with less stringent standards, States had no incentive to adopt strict legislation.
In that uniformity does not appear to have been Congress’ primary goal in enacting the Act, we believe that State enforcement of criminal law does not conflict with Federal law by "standing] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.” (Hines v Davidowitz, 312 US 52, 67, supra.) In fact, criminal prosecutions under State criminal law would seem to further the goal of ensuring the safety and health of American workers by deterring future instances of criminally culpable employer conduct. We agree with the Appellate Division that appellants’ concern that an employer could fully comply with Federal standards while still being subject to the Penal Law is a "hollow one” (151 AD2d 133, 140).
In addition, we do not believe that it is a physical impossibility to comply with both State and Federal law in this area, which is the second ground for a finding of conflict preemption. The Act does not require an employer to engage in conduct that is prohibited by the State of New York, nor is the reverse true.
Finally, we would conclude by noting that our holding today is consistent with decisions from the Supreme Courts of Illinois and Michigan, which have already considered this same issue (People v Hegedus, 432 Mich 598, 443 NW2d 127 supra; People v Chicago Magnet Wire Corp., 126 111 2d 356, 534 NE2d 962, supra; but see, Sabine Consol, v State of Texas, 756 SW2d 865 [Tex App]).
*526 We have considered the appellants’ remaining arguments and we find them to be without merit. Accordingly, the order of the Appellate Division should be affirmed.
Judges Simons, Kaye, Alexander, Titone, Hancock, Jr., and Bellacosa concur.
Order affirmed.