OPINION OF THE COURT
Laura E. Drager, J.
The Museum of Modern Art (the Museum) moves to quash a Grand Jury subpoena issued by the New York County District Attorney (the People) for two paintings by the Austrian artist Egon Schiele, “Portrait of Wally” and “Dead City III” (the Paintings).[1]
The court must decide if the Paintings are exempt from Grand Jury process under section 12.03 of the New York Arts and Cultural Affairs Law. Even if the New York law applies, the court must then decide if the Federal statute, the Immunity From Seizure Act, 22 USC § 2459 (the IFSA), preempts the State law with respect to works of art on loan from foreign countries.
The Paintings were among 150 works of art displayed at the Museum in an exhibition entitled “Egon Schiele: The Leopold Collection, Vienna.” The collection was on loan from the Leopold Museum of Austria. The exhibition had been on a *987 world-wide tour for three years. The Museum exhibited the collection for three months.[2]
On December 31, 1997, the Museum received letters from persons who claimed the Paintings were stolen or otherwise misappropriated from their rightful owners during the Nazi annexation of Austria (1938-1945).
Henry Bondi wrote that his aunt, Lea Bondi, owned “Portrait of Wally”. She died in 1969. Rita and Kathleen Reif, writing on behalf of the heirs of Fritz Grunbaum, stated that the painting “Dead City III” was stolen from his collection. He subsequently died in the Dachau concentration camp. The claimants contended that neither original owner nor the respective heirs consented to any sale or transfer of their painting and requested that the Museum not return the Paintings to the lender until the matter of true ownership was resolved.[3]
According to a press report, the Paintings were acquired by Dr. Rudolf Leopold, an avid art collector, who amassed a large number of Schiele paintings. He purchased the Paintings sometime in the 1950’s and 1960’s. The press report suggests that at some point Lea Bondi sought Dr. Leopold’s help to recover “Portrait of Wally”. Instead, he purchased it for himself. In any event, Dr. Leopold apparently purchased both Paintings after several intervening buyers following the war. (Dabrowski and Leopold, Egon Schiele, The Leopold Collection, Vienna, Catalogue, at 144, 195 [1997].) In 1994, Dr. Leopold sold his art collection, including his Schiele collection of 250 works, to the Leopold Foundation of Vienna, Austria, for $175 million.[4]
The Museum states that it had no knowledge of the existence of any claims with respect to the Paintings. Over the course of the last few decades, the two Paintings have been exhibited and published around the world. One of the Paintings, “Dead City III”, had previously been exhibited in New York at the Guggenheim Museum. Apparently, at no time had Lea Bondi or her heirs or the heirs of Fritz Grunbaum ever filed a claim in any court for the return of either painting.
On January 3, 1998, the Museum advised the claimants by letter that it was not in a position to pass on their claims. On *988 January 7, 1998, the People served the subpoena on the Musuem as part of a criminal investigation into stolen property.
The Museum contends that the success of New York’s museums in presenting first class exhibitions on a consistent basis is dependent, in part, on their ability to provide assurances to art lenders that their works will be safely returned. To satisfy this concern, for the past 30 years New York cultural institutions have relied on a State law which exempts from seizure any art lent to a cultural institution by a nonresident exhibitor. (Arts and Cultural Affairs Law § 12.03.) The Museum believed this law to be absolute and all encompassing. In contrast, the People believe that the protection of this law is limited to seizures in civil actions and does not extend to criminal investigations.
A Federal law (IFSA, 22 USC § 2459) provides similar protection, but with significant differences. The Federal law extends only to works on loan from abroad. The vast majority of art borrowed by United States museums comes from lenders within the country. If the New York statute does not provide protection from criminal as well as civil proceedings, the Museum fears that the ability of New York cultural institutions to borrow art from within the country as well as from abroad will be seriously compromised. The People counter that no other State has a law comparable to Arts and Cultural Affairs Law § 12.03 and yet other States are not hampered in exhibiting borrowed art. Moreover, lenders will continue to want their art exhibited at internationally renowned institutions such as the Museum since such recognition enhances the value of the art.
Equally significant, the Federal statute requires an application with the United States Information Agency, which must determine that the art is of cultural significance and that the exhibition is in the national interest. Only after this determination is made, and the decision is published in the Federal Register, is the art safe from both civil and criminal process. According to the Museum, New York cultural institutions often eliminate this time-consuming process, relying instead on what they believed to be the automatic protection from any kind of seizure afforded by the New York law. The Museum rarely applies for protection under the Federal act, having done so in only 4 of its 89 exhibitions in the past three years. In those four instances, the Museum sought protection under the Federal law at the request of the lenders. In each case, protec *989 tion under the Federal law was granted. The Museum did not seek protection under the Federal law for the Schiele exhibition.
I
The Museum argues that the Paintings are exempt from Grand Jury process pursuant to the New York Exemption from Seizure Law, Arts and Cultural Affairs Law § 12.03.
That statute, which has never been the subject of court scrutiny, provides: “No process of attachment, execution, sequestration, replevin, distress or any kind of seizure shall be served or levied upon any work of fine art while the same is enroute to or from, or while on exhibition or deposited by a nonresident exhibitor at any exhibition held under the auspices or supervision of any museum, college, university or other nonprofit art gallery, institution or organization within any city or county of this state for any cultural, educational, charitable or other purpose not conducted for profit to the exhibitor, nor shall such work of fine art be subject to attachment, seizure, levy or sale, for any cause whatever in the hands of the authorities of such exhibition or otherwise.” (Arts and Cultural Affairs Law § 12.03.)
The Museum contends that the purpose of the statute is to encourage the free flow of art from around the world and within the United States for exhibition in New York, thereby enhancing the State’s position as an international cultural center. The statute provides unqualified protection from court process to art on loan from outside the State to New York cultural institutions. The statute’s prohibition against “any kind of seizure” encompasses Grand Jury subpoenas.
The People counter that the Grand Jury has been given broad powers to investigate crime. Nothing within the text of Arts and Cultural Affairs Law § 12.03 indicates that the Legislature intended to restrict the Grand Jury power to issue subpoenas for art work covered by its provisions.[5] Rather, the People argue, the plain import of the statutory language, along with its legislative history, reveals the act was intended to apply solely to civil remedies.[6]
The governing rule of statutory construction is that “courts are obliged to interpret a statute to effectuate the intent *990 of the Legislature, and when the statutory ‘language is clear and unambiguous, it should be construed so as to give effect to the plain meaning of [the] words’ used”. (People v Finnegan, 85 NY2d 53, 58 [1995] [citations omitted].) The clear import of the term “any kind of seizure” leaves no doubt that the Legislature intended to prohibit any court process that would interfere with art work on loan from out of State.
A “seizure” occurs “when there is some meaningful interference with an individual’s possessory interests in * * * property.” (United States v Jacobsen, 466 US 109, 113 [1984]; Soldal v Cook County, 506 US 56, 61 [1992].) Similarly, in common usage, seizure is defined as “the act of taking possession of person or property by virtue of a warrant or legal authority”. (Webster’s Third New International Dictionary 2057 [3d ed 1993].) “[T]he word ‘any’ means ‘all’ or ‘every’ and imports no limitation.” (Zion v Kurtz, 50 NY2d 92, 104 [1980].) The statutory language is plain and unqualified.
The fact that a Grand Jury subpoena is not considered a seizure for constitutional purposes, as the People contend, is of no import. (See, United States v Dionisio, 410 US 1, 9 [1973]; Matter of Grand Jury Subpoenas for Locals 17, 135, 257 & 608, 72 NY2d 307, 315-316 [1988]; Matter of Hynes v Moskowitz, 44 NY2d 383, 395 [1978].) Although a Grand Jury subpoena may not be subject to the requirements of the Fourth Amendment necessitating a probable cause showing before items can be seized, it still results in a seizure in the ordinary sense of the word. Because Arts and Cultural Affairs Law § 12.03 precludes “any kind of seizure” (emphasis added), its protection is not limited to seizures protected under the US Constitution.
The Grand Jury has the right to “possess and retain” subpoenaed evidence. In the absence of a court ruling limiting the issuer’s right to retain the evidence, “the prosecutor may lawfully exercise dominion and control over the evidence.” (Matter of Brunswick Hosp. Ctr. v Hynes, 52 NY2d 333, 338 [1981]; CPL 610.25.) The issuance of the Grand Jury subpoena for the Paintings resulted in an immediate “meaningful interference” with the lender’s “possessory interest” in the *991 Paintings. The Paintings were scheduled to leave New York in January 1998 to continue on tour in Spain. Instead, they remain in New York. Thus, the subpoena effected a seizure of the Paintings.
The People further argue that a tenet of statutory construction, ejusdem generis, limits the phrase “any kind of seizure” to civil remedies. This rule “requires the court to limit general language of a statute by specific phrases which have preceded the general language.” (McKinneys Cons Laws of NY, Book 1, Statutes §239 [b].) Because all of the exemptions preceding the words “any kind of seizure” pertain to civil remedies, the People contend that this general phrase is necessarily limited to any other civil remedy not specifically listed.
This rule of construction is intended “to save the Legislature from spelling out in advance every contingency in which the statute could apply”. (People v Illardo, 48 NY2d 408, 416 [1979].) The rule typically applies when the final phrase of the particularized listing includes the word “other”, suggesting a continuation of the same type of situation just enumerated. (See, e.g., People v Shapiro, 50 NY2d 747, 764 [1980]; Matter of Manhattan Pizza Hut v New York State Human Rights Appeal Bd., 51 NY2d 506, 512 [1980].)
However, when the final phrase is simply another term intended to cover a different situation, ejusdem generis does not apply. (See, People v Cooperage Co., 72 NY2d 579, 584 [1988].) The absence of the word “other” or similar term “tends to show an independence of the various terms”. (McKinney’s Cons Laws of NY, Book 1, Statutes § 239 [b], at 411.) Even the use of the term “any other” suggests “a broader application than if simply the word ‘other’ had been employed.” (Ibid.) The statutory phrase here is “any kind of seizure”, not “other seizure” or even “any other kind of seizure.” The phrase is broad, unlimited and unambiguous. (See, Garcia v United States, 469 US 70, 74-75 [1984].)
Moreover, ejusdem generis does not apply “where it contradicts the evident intent of the Legislature.” (McKinneys Cons Laws of NY, Book 1, Statutes § 239 [b].) Rules of statutory construction will not be used to defeat the clear intent of the Legislature or “create an intolerable loophole in a statutory scheme” (People v Cooperage Co., supra, 72 NY2d, at 584; see also, People v First Meridian Planning Corp., 86 NY2d 608, 619 [1995]).
A review of the statutory history confirms that the Legislature intended the act to provide the broadest possible protec *992 tion for out-of-State art work on loan to New York cultural institutions. In his Memorandum approving the bill, Governor Nelson Rockefeller stated:
“Many of the most important events of the artistic year through the State consist of special shows devoted to a special theme * * * These exhibitions * * * rely * * * on loans of works of art for their success. The promotion and continuation of these events is necessary to maintain New York’s status as the art center of the Nation and is beneficial to the general cultural atmosphere of the State * * *
“The bill, by exempting such works of art from legal process where their presence in the State of New York is solely by the generosity of the exhibitor and not for any commercial purpose, will go far to allay the fears of potential exhibitors and enable the State of New York to maintain its pre-eminent position in the arts.” (Governor’s Mem in support, 1968 McKinney’s Session Laws of NY, at 2396-2397.)
As reflected in the legislative history, the impetus for the bill was a civil lawsuit. (Governor’s Mem in support, op. cit.; Mem of Attorney-General Lefkowitz in support, May 20, 1968, Bill Jacket, L 1968, ch 1065, at 3.) Undoubtedly, the focus of the legislators in enacting the statute was to address the consequences of civil remedies against art on loan. However, the statutory history reveals that the intent of the Legislature was to provide the covered art even broader protection than from just civil remedies.
The effect of the proposed statute on stolen art work was brought directly before the Legislature. The Committee on State Legislation of the Association of the Bar of the City of New York (the Bar Association), in disapproving the bill, expressed concern that the statute would prevent a rightful owner from recovering stolen art. “[I]f the plaintiff, including a resident of this State, alleges that a work on exhibit has been stolen from him or unlawfully retained by a bailee, he may nonetheless not replevy the property if the criteria of the bill are met.” (Mem No. 122 of Assn of Bar of City of NY, June 17, 1968, Bill Jacket, L 1968, ch 1065, at 18 [emphasis added].) The Bar Association proposed that, at the very least, an exception be made for judgment-creditors.[7]
In rejecting this proposed modification, Attorney-General Louis Lefkowitz, the bill’s sponsor, wrote, “To puncture the *993 exemption sought by this bill with a single major loophole * * * thus forcing ‘potential-lenders-in-good-faith’ to seek legal advice before lending their works to museums of this State would be self-defeating, since non-resident artists and patrons of the arts can exercise their free alternative to stay out of trouble by keeping their possessions safely at home.” (Supp Mem of Attorney-General Lefkowitz in support, June 14, 1968, Bill Jacket, L 1968, ch 1065, at 9.)
The Attorney-General, the highest law enforcement officer of the State, is presumed to have recognized the potential consequences of the statute in criminal investigations. In any event, the direct references by the Bar Association and the Attorney-General to the effect of the statute on stolen art, albeit in the context of a civil action, removes any doubt that the enactment was intended to provide coverage for all seizures, whether in the context of a civil action or criminal investigation.
In further support of the legislative intent is the fact that the statute was initially included within the General Business Law, a substantive series of enactments replete with criminal penalties often prosecuted by the Attorney-General’s office. (See generally, General Business Law arts 1-40.) The Bar Association’s recommendation that the statute be placed within the Civil Practice Law and Rules (the CPLR) where civil remedies are typically found, was specifically rejected.[8]
“ ‘In construing statutory provisions, the spirit and purpose of the statute and the objectives sought to be accomplished by the legislature must be borne in mind.’ ” (Matter of Hogan v Culkin, 18 NY2d 330, 335 [1966] [citations omitted]; Albright v Metz, 88 NY2d 656, 664 [1996]; Matter of Long v Adirondack Park Agency, 76 NY2d 416, 422 [1990]; Matter of Sutka v Conners, 73 NY2d 395, 403 [1989]; McKinney’s Cons Laws of NY, Book 1, Statutes § 96.) The Legislature determined, in balancing policy considerations, that it was in the State’s interest to protect cultural institutions and their ability to encourage the exchange of art for the benefit of the entire populace over the needs of a few individuals to recover their art, even if the art was stolen. “The primary policy concern of this bill is not with the lenders, but with the museums and other cultural institutions of this State which are completely and thoroughly dependent upon the free flow of works of art into the State for the *994 purpose of conducting exhibitions of major public interest. The exemption conferred by this bill upon the lenders of works of art is a small favor for the other risks involved in crating, shipping and exposing these works, often of fragile construction, to large New York audiences. Considering the alternatives open to potential lenders — to keep their works at home — it would seem that the State of New York is in no morally tenable position to bargain and equivocate over the scope of this bill if the cultural welfare of the People and their cultural institutions is of any real significance to its lawmakers and if this bill serves that welfare.” (Supp Mem of Attorney-General Lefkowitz in support, op. cit., at 10 [emphasis in original].)
The People argue that it could not have been the intent of the Legislature to extend the reach of the statute to prohibit the issuance of a Grand Jury subpoena. The Grand Jury serves a vital function in the criminal justice system and has been invested with broad investigatory powers. (See, Matter of Grand Jury Subpoenas, 58 AD2d 1, 3-4 [1st Dept 1977]; People v Doe, 84 AD2d 182, 193, 196 [2d Dept 1981]; see also, Branzburg v Hayes, 408 US 665, 686-688 [1972].) It may conduct investigations based on any kind of reliable source, including even rumor or suspicion. (See, People ex rel. Travis v Knott, 204 App Div 379, 383 [1st Dept 1923]; People v Doe, supra, 84 AD2d, at 196; Matter of Grand Jury Subpoenas, supra, 58 AD2d, at 3.)
To serve these ends, the Grand Jury is accorded the power of compulsory process for both testimonial and physical evidence. (CPL 190.50 [3]; 610.10, 610.20 [2].) It has generally been held not to be in the public interest to place restrictions on the Grand Jury process. (See, Virag v Hynes, 54 NY2d 437 [1981]:) “Traditionally, our courts have afforded the Grand Jury the widest possible latitude in the exercise of these powers and insisted that in the absence of a clear constitutional or legislative expression they may not be curtailed”. (Matter of Grand Jury Subpoenas, 58 AD2d, supra, at 4; People v Doe, 84 AD2d, supra, at 193, citing People v Stern, 3 NY2d 658, 661 [1958].) Because Arts and Cultural Affairs Law § 12.03 does not, on its face, restrict the power of the Grand Jury or limit a criminal investigation, the People argue that the Grand Jury subpoena must stand.
The People’s position seeks to complicate an otherwise simple statute. The statute is unqualified. It is a general rule of New York statutory construction that “the failure of the Legislature to include a substantive, significant prescription in a statute is *995 a strong indication that its exclusion was intended”. (People v Finnegan, 85 NY2d 53, 58, supra; People v Tychanski, 78 NY2d 909, 911 [1991].)
Even though the Grand Jury has broad authority, its powers are subject to statutory limitations. On occasion, the Legislature has determined that in balancing competing interests, the need for unfettered Grand Jury investigations must yield to other policy considerations. Where the Legislature limits those powers “it may do so explicitly or by implication”. (Matter of Stern v Morgenthau, 62 NY2d 331, 337 [1984].)
In some instances the Legislature has limited the authority of the Grand Jury even though the effect has been to preclude any Grand Jury investigation. In Matter of Beach v Shanley (62 NY2d 241 [1984]) the Court found that the Legislature intended to create an absolute privilege under the Shield Law for reporters (Civil Rights Law § 79-h), even if the act of disclosure by the informant to the reporter was itself a crime and the effect of the privilege was to stymie the investigation. The Court refused to carve out an exception for Grand Jury investigations “without any qualifying [statutory] language” (supra, at 251). Similarly, in Matter of Grand Jury Investigation of Onondaga County (59 NY2d 130 [1983]), the Court held that the doctor-patient privilege, which encourages full disclosure by a patient to ensure proper treatment, could not be breached by a Grand Jury subpoena, even though the effect was to thwart a homicide investigation. (See also, Matter of New York State Dept. of Taxation & Fin. v New York State Dept. of Law, 44 NY2d 575 [1978].)
Here, the result of quashing the Grand Jury subpoena is not nearly so drastic. The Grand Jury is not precluded from proceeding with its investigation; it simply cannot retain the Paintings.[9] But, in point of fact, the Paintings are not needed for the investigation. The present owner, provenance, value and whereabouts of the Paintings are known. Indeed, Lea Bondi and Fritz Grunbaum are openly acknowledged by the Leopold Foundation to have owned their respective Paintings. (Dabrowski and Leopold, op. cit., at 144, 195.)
The whereabouts of art work covered by this statute will always be known, even if privately held. After all, the owner is *996 willing to lend the art for public viewing. The far more troubling scenario occurs when art is stolen and then held privately for years, its location unknown and undiscoverable. (See, Guggenheim Found. v Lubell, 77 NY2d 311 [1991].)
The statute merely precludes the use of a temporary exhibition as a mechanism to seize art.[10] Claimants lose no potential rights they might have to the art; they simply cannot use a temporary exhibition in New York to avoid pursuing their claims where the art originated.[11]
Both parties have raised compelling policy concerns. Words cannot convey the horror of the Holocaust. But the tragedy of that event, although casting a pall over this matter, is not at issue here. However, it is indeed troubling if museums and cultural institutions, which are sources of civilized values, are, as the People contend, turning a blind eye to the exhibition of stolen art. Conceivably a Grand Jury investigation may uncover inappropriate or unlawful practices by such institutions and lenders, but the Paintings themselves are not needed for the exploration of this issue. Moreover, it appears the museums themselves are taking recognition of the fact that as cultural institutions they must hold themselves to a higher standard. (See, Dobrzynski, Lenders Pull Two Bonnards From a Show at the Modem, NY Times, Apr. 29, 1998, at Cl; d’Arcy, Europeans Support US Museum Over Schiele Nazi Loot, 80 The Art Newspaper 9 [Apr. 1998].)
*997 On the other hand, the Museum argues that converting what is really a civil matter into a secret Grand Jury proceeding is not a fair mechanism for resolving the ownership issues in a case of this sort.[12] Furthermore, to require a museum to have to verify the provenance of every piece of art on loan for a temporary exhibition would be unduly burdensome. The effect of the People’s action here has, according to the Museum, already discouraged some potential lenders of art.
In setting public policy, it is often necessary to consider competing concerns. Resolution of these issues frequently results in compromises that will not satisfy everyone. The statute has served the State well in enhancing its position as a cultural center. It is well settled “that courts are not to legislate under the guise of interpretation”. (People v Finnegan, 85 NY2d, supra, at 58.) The legislative intent is clear and the statutory language unambiguous. In accordance with Arts and Cultural Affairs Law § 12.03, the Grand Jury subpoena must be quashed.
II
The People contend that the application of Arts and Cultural Affairs Law § 12.03 to art on loan from foreign countries is preempted by the Federal statute, the Immunity From Seizure Act, 22 USC § 2459.[13]
*998 The IFSA was enacted in 1965, three years before the enactment of Arts and Cultural Affairs Law § 12.03. The Federal law provides that whenever a work of art is imported from a foreign country to be exhibited at a not-for-profit cultural institution, the art will not be subject to any judicial process, State or Federal, if certain requirements are met. To receive the protection of the statute, prior to importation, the United States Information Agency must determine that the art is of cultural significance and that the temporary exhibition is in the national interest. Notice of the decision must also be published in the Federal Register. (See, Executive Order No. 12047, § 1, 43 Fed Reg 13359 [1978], as amended by Executive Order No. 12388, 47 Fed Reg 46245 [1982].)
State law is preempted under the Supremacy Clause (US Const, art VI, cl 2) in three circumstances. First, Congress in its enactment can explicitly preempt State law. (See, e.g., English v General Elec. Co., 496 US 72, 78 [1990]; People v Pymm, 76 NY2d 511, 519 [1990].)
Second, in the absence of explicit statutory language, State law is preempted if the field of regulated conduct is one Congress implicitly intended to occupy exclusively. “Such an intent may be inferred from a ‘scheme of federal regulation * * * so pervasive * * * that Congress left no room for the States to supplement it,’ or where an Act of Congress ‘touch [es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.’ ” (English v General Elec. Co., 496 US, supra, at 79, quoting Rice v Santa Fe El. Corp., 331 US 218, 230 [1947].)
Third, State law is preempted to the extent it actually conflicts with the Federal statute. (See, e.g., Pacific Gas & Elec. v Energy Resources Commn., 461 US 190, 204 [1983]; People v Pymm, 76 NY2d, supra, at 519; People v Broady, 5 NY2d 500, 513 [1959].) Such conflict arises when it would be impossible for a private party to comply with both statutes (see, Florida Avocado Growers v Paul, 373 US 132, 142-143 [1963]) or where the State law “stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.” (Hines v Davidowitz, 312 US 52, 67 [1941].)
Preemption is fundamentally a question of congressional intent. “[W]hen Congress has made its intent known through *999 explicit statutory language, the courts’ task is an easy one.” (English v General Elec. Co., 496 US, supra, at 79.) Where the congressional intent must be inferred, as in the area of “field preemption,” and the field includes areas that the States have traditionally occupied, “congressional intent to supersede state laws must be ‘ “clear and manifest” ’.” (English v General Elec. Co., at 79, quoting Jones v Rath Packing Co., 430 US 519, 525 [1977]; Rice v Santa Fe El. Corp., supra, 331 US, at 230.)
The People contend that the Federal statute implicitly preempts Arts and Cultural Affairs Law § 12.03 with respect to foreign art because (1) the Federal statute is so comprehensive that Congress left no room for State enactments; (2) Federal interests pertaining to foreign affairs dominate; and (3) the State statute frustrates the congressional purpose in enacting the Federal statute.[14]
The People claim the IFSA is comprehensive, fully addressing the issue of immunity from seizure for works of art on loan from abroad. Therefore, there is no room for the New York statute to address the same issue. The United States Supreme Court, however, has repeatedly refused to void State statutory requirements absent a congressional intent to preempt. “ Tf Congress is authorized to act in a field, it should manifest its intention clearly. It will not be presumed that a federal statute was intended to supersede the exercise of the power of the state unless there is a clear manifestation of intention to do so.’ ” (New York Dept. of Social Servs. v Dublino, 413 US 405, 413 [1973], quoting Schwartz v Texas, 344 US 199, 202-203 [1952].)
Nothing within the IFSA or its supporting regulation suggests that Congress considered the mechanism it created necessarily to provide the exclusive means for the protection of foreign art. Moreover, the IFSA can hardly be considered comprehensive since it does not address all foreign art potentially loaned for exhibition in this country.[15] While it provides a mechanism to protect art where an application is made under the statute, it does not require that an application for protection be made for all art entering the country. This *1000 court finds the Federal statute is not comprehensive nor does it contain any implicit intent that a complementary State regulation is preempted.
The People further contend that the Federal statute implicates significant foreign relations issues. Because foreign affairs is a field in which Federal interests dominate, preemption of the New York statute necessarily follows.
One of the central themes of the Federal statute is that before art work will be given protection under that law, the proposed exhibition must be found to be in the national interest. (22 USC § 2459.) Foreign affairs clearly is an area where Federal interests dominate. “[W]here the federal government, in the exercise of its superior authority in [the foreign affairs] field, has enacted a complete scheme of regulation * * * states cannot, inconsistently with the purpose of Congress, conflict or interfere with, curtail or complement, the federal law, or enforce additional or auxiliary regulations.” (Hines v Davidowitz, supra, 312 US, at 66-67.)
But even in the Hines decision (supra), the sole case relied on by the People on the issue of Federal dominance, the Court did not decide that the State law under review was preempted simply because it touched upon the area of foreign affairs. Rather, the Court considered that its “primary function” was to determine whether the State law stood “as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress” (supra, at 67).[16]
The involvement of foreign affairs does not necessarily lead the Supreme Court to preempt a State statute. “Only a demonstration that complete ouster of state power — including state power to promulgate laws not in conflict with federal laws— was ‘ “the clear and manifest purpose of Congress” ’ would justify that conclusion.” (De Canas v Bica, 424 US 351, 357 [1976] [citation omitted]; Boyle v United Technologies Corp., 487 US 500, 507 [1988]; see also, Clark v Allen, 331 US 503 [1947].)
A review of the legislative history of the IFSA reveals that the primary purpose of the statute was not its impact on foreign affairs, but its encouragement of educational and *1001 cultural interchange. (HR Rep No. 89-1070, 89th Cong, 1st Sess, Sept. 22, 1965.)
The sole purpose of the Federal statute is to provide protection to art work. The law does not limit art from entering the country even if approval under the statute is not obtained. Presumably, if the issue of foreign relations was the dominant concern, a more comprehensive approach to foreign art entering the country would have been enacted. Exposure of citizens to works of fine art may be legitimate aims of both Federal and State governments. Without a clear and manifest intent expressed by Congress to limit State regulation in this area, the Federal law cannot be found to preempt the State statute because of a dominance of a Federal interest.
The People’s final contention is that the State law is preempted because it frustrates the congressional purpose in enacting the IFSA. A State statute is preempted “where * * * adherence to the State * * * law would thwart the objectives of its Federal counterpart”. (City of New York v Job-Lot Pushcart, 88 NY2d 163, 167 [1996].) To find preemption “an irreconcilable conflict between the federal and state regulating schemes [must exist.] The existence of a hypothetical or potential conflict is insufficient to warrant the pre-emption of the state statute.” (Rice v Williams Co., 458 US 654, 659 [1982].)
Quite simply, no conflict exists between the Federal and the New York statutes. Both statutes seek to protect foreign art from judicial process while on loan to not-for-profit institutions. Both statutes seek to accomplish this end to advance cultural benefits to the residents of the United States and New York. The difference between the two statutes is that, under New York law, the art is given automatic protection whereas under the Federal statute one must apply for protection.
As occurs in many other areas of complementary Federal/ State regulation, the provisions of the IFSA provide a floor of protection by which all States and the Federal Government are bound. However, nothing within the Federal statute precludes New York from providing greater protection. (See, Atherton v Federal Deposit Ins. Corp., 519 US 213, 227-228 [1997]; California Fed. Sav. & Loan Assn. v Guerra, 479 US 272, 285 [1987]; People v Pymm, 76 NY2d 511, 524, supra.)
The People argue that the New York statute is at cross-purposes with the IFSA because the State law enables New York cultural institutions to avoid compliance with the Federal statute. In addition, foreign owners might be more inclined to *1002 lend art to New York institutions over those of other States rather than contend with the IFSA compliance requirements. However, compliance under the IFSA is not mandatory. Moreover, New York should not be faulted for providing an atmosphere conducive to the temporary exhibition of foreign art. With its vast array of cultural institutions, New York has a unique interest in maximizing the possibility of exhibiting art on loan from other States and around the world. In any event, New York’s legislative response in enacting Arts and Cultural Affairs Law § 12.03 does not preclude other States from granting similar protection to foreign art.
In sum, the New York statute is not preempted by the IFSA and the motion to quash the Grand Jury subpoena is granted.

. Both the Museum and the People waived the secrecy provisions for proceedings pertaining to a Grand Jury subpoena duces tecum and motion to quash in accordance with CPL 190.50 (7).

. Both parties submitted documents and affidavits in support of their arguments. References to those documents have been deleted in this edited version of the court’s opinion.

. Rita Reif resides in New York, Kathleen Reif resides in Canada and Henry Bóndi resides in New Jersey.

. Dobrzynski, A Singular Passion For Amassing Art, One Way or Another, NY Times, Dec. 24, 1997, at El.

. Both parties agree that a Grand Jury subpoena duces tecum is a “process of a court”. (GPL 610.10 [2]-[3].)

. As a threshold issue, the People argue that the Leopold Foundation may have profited from the exhibition. If so, the Paintings would not be covered by the statute since its protection applies only if the nonresident ex *990 hibitor receives no profit from the exhibition in New York. Based on information provided by the Museum, the court is satisfied that the Leopold Museum (which, for purposes here, is synonymous with the Leopold Foundation) is a not-for-profit entity under Austrian law and that the amount of money it received in connection with the exhibition at the Museum ($60,000 and a portion of the profits from catalogue sales) simply defrayed the costs incurred by the Leopold Museum in connection with the exhibition. Thus, the lender did not profit from the New York exhibition.

. Specifically, the Bar Association suggested a distinction be made between the use of provisional remedies to seize art work on loan to acquire quasi-in rem jurisdiction as opposed to postjudgment remedies. (Ibid.)

. For the same reason, the People’s argument that the statutory language evolved from a provision pertaining solely to civil remedies loses relevance in light of the placement of the statute in the General Business Law.

. The Museum had offered to provide photographic copies of the Paintings. (CPL 610.25 [2].) The People rejected this proposal. The court would authorize the taking of photographs to preserve the evidence for the Grand Jury since such action could be done immediately and would not meaningfully interfere with the possession of the Paintings. Thus, the taking of the photographs would not constitute a seizure.

. Plainly the State Legislature determined that nonresident lenders should not have to face legal action in New York State. Similarly, New York courts should not have to resolve an issue of ownership of property not stolen in this State or permanently situated here.

. Moreover, assuming the claimants here are the rightful owners, it is questionable whether a criminal investigation could ultimately lead to a return of the art by avoiding a civil remedy, a solution the People admit is precluded by statute. A Grand Jury subpoena is not intended to secure property for all time, but, rather, for a reasonable period of time. The intent of the statutory provision governing Grand Jury subpoenas is to return the property to the entity which was served with the subpoena. (CPL 610.25.) The People contend that it would be inappropriate, if the Paintings were stolen, to return them to the Museum until the issue of rightful ownership is settled. The People rely on Penal Law § 450.10 which sets forth the mechanism to be used to return allegedly stolen property to an owner prior to or during the pendency of a criminal proceeding. Even if applicable, this provision requires proof of title before property in the custody of the People or the court can be returned. Because Penal Law § 450.10 does not set forth a mechanism for determining rightful ownership, it is likely that this issue would have to be resolved in the context of a civil proceeding. Moreover, it is worth noting that even a sentence after conviction ordering return of property either in the form of restitution or reparations is entered as a civil judgment. (CPL 420.10 [6].)

. With respect to both Paintings, the issue is not who originally owned the art or who possesses the art now. In both cases, the issue is what happened to the art in between those points of reference. For instance, it does not appear that Mrs. Bondi, who survived the war residing in London, ever took legal action to seek recovery of her painting even though she knew where it was located as early as 1946. In the case of the painting owned by Mr. Grunbaum, recent reports suggest it was sold by a rightful heir in 1956. (Dobrzynsky, German Court Revokes Ruling on Ownership of a Schiele Painting, NY Times, Apr. 16, 1998, at E6.)

. 22 USC § 2459 (a) provides: “Whenever any work of art or other object of cultural significance is imported into the United States from any foreign country, pursuant to an agreement entered into between the foreign owner * * * and the United States or one or more cultural or educational institutions within the United States providing for the temporary exhibition or display thereof within the United States at any cultural exhibition * * * administered, operated, or sponsored, without profit, by any such cultural or educational institution, no court of the United States, any State, the District of Columbia, or any territory or possession of the United States may issue or enforce any judicial process, or enter any judgment, decree, or order, for the purpose or having the effect of depriving such institution, or any carrier engaged in transporting such work or object within the United States, of custody or control of such object if before the importation of such object the President or his designee has determined that such object is of cultural sig *998 nificance and that the temporary exhibition or display thereof within the United States is in the national interest, and a notice to that effect has been published in the Federal Register.”

. The People concede that the Federal statute contains no language explicitly preempting State regulation in this area. The People further concede that there is no conflict between the statutes that would make it impossible for a private party to comply with both laws.

. Apparently, this case has helped generate efforts, for the first time, to create comprehensive regulations under the Federal statute. (NY Times, Apr. 29, 1998, at El.)

. The Hines case {supra) concerned a State law requiring registration of alien residents. In holding this law preempted, the Court found that the Federal alien registration system had developed over many years, was fully comprehensive, avoided discrimination against aliens, and was tied to a number of treaties with foreign countries. That is hardly the situation here.